IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| **DAWUD J. BEST, individually and on behalf of others similarly situated,** | * | |
| | * | |
| **Plaintiff,** | | |
| **v.** | * | **Case No.: GJH-19-2331** |
| **NEWREZ LLC,** *et al.*, | * | |
| **Defendants.** | * | |
| | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

**MEMORANDUM OPINION**

Plaintiff Dawud J. Best filed this action on August 14, 2019 against Newrez LLC, which does business as Shellpoint Mortgage Servicing ("Shellpoint"), Federal National Mortgage Association ("Fannie Mae"), and Brock & Scott, PLLC ("B&S"), seeking damages for conduct surrounding the servicing of his residential mortgage loan. Plaintiff alleges violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-201 *et seq.*, the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101 *et seq.*, the Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. § 7-401 *et seq.*, the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

Plaintiff has filed a Complaint, ECF No. 1, a First Amended Complaint, ECF No. 19, a Corrected First Amended Complaint ("CFAC"), ECF No. 20, and a Motion for Leave to File a Second Amended Complaint, ECF No. 30, accompanied by a proposed Second Amended

Complaint, ECF No. 30-3. B&S has moved to dismiss each version of the Complaint, ECF Nos. 12, 24, 33, while Shellpoint and Fannie Mae have together moved to dismiss the Complaint and the CFAC, ECF Nos. 14, 22, and have opposed the Motion for Leave, ECF No. 34. No hearing is necessary. *See* Loc. Rule 105.6. (D. Md.). For the following reasons, Shellpoint and Fannie Mae's motion to dismiss the CFAC will be granted in part and denied in part, Plaintiff's motion for leave will be granted in part and denied in part, and B&S and Fannie Mae will be dismissed from this action.

## I.     BACKGROUND

Plaintiff has been engaged in litigation concerning his residential mortgage debt for nearly a decade. On March 30, 2020, the Court issued an opinion granting in part and denying in part the defendants' motion for summary judgment in Plaintiff's case against B&S, Fannie Mae, and other entities in which Plaintiff raised claims similar to those in this action. *Best v. Fed. Nat'l Mortg. Ass'n*, No. GJH-17-314, 2020 WL 1503676 (D. Md. Mar. 30, 2020). The Court's opinion in that case, which is referred to below as *Best III*, recounted Plaintiff's lengthy history of both state and federal court litigation related to his property. Because that history provides context for the claims at issue in this case, the Court relates its key elements here, incorporating some allegations from the CFAC as necessary.

### A.  Litigation History

Plaintiff is the owner of real property located at 5800 Carlyle Street, Cheverly, Maryland. ECF No. 20 ¶ 8. Plaintiff's purchase of the property was financed with a promissory note ("Note") secured by a Deed of Trust. *Id.* ¶ 9. According to the CFAC, at some point after Plaintiff initiated the loan, Capital One, N.A. ("Capital One") informed Plaintiff that it had acquired the Note and was the servicer for the loan's owner, Defendant Fannie Mae. *Id.* ¶ 10.

2

On October 23, 2012, substitute trustees appointed by Capital One initiated proceedings to foreclose on the loan in the Circuit Court for Prince George's County. *See Best v. Driscoll*, No. 0959, Sept. Term, 2013, 2015 WL 5933669, at *1 (Md. App. June 18, 2015). On February 21, 2013, Plaintiff moved to stay and dismiss the foreclosure, asserting that Capital One was not the holder of his Note and therefore could not appoint substitute trustees, among other claims. *Id.* at *2–*3. At a hearing on May 3, 2013, the Circuit Court found that a document the defendants introduced was the original Note bearing Plaintiff's signature, that it was in Capital One's possession, and that the trustees and Capital One had standing to foreclose. *Id.* at *5. The court thus denied Plaintiff's stay motion and ruled that the foreclosure sale could proceed. *Id.* at *6. The court also dismissed as untimely counterclaims that Plaintiff had filed alleging breach of contract and violations of the MCDCA and MCPA. *Id.*[1] The Maryland Court of Special Appeals found that the counterclaims were timely but affirmed the dismissal on June 28, 2015. *Id.* at *11.

Following his loss in the Circuit Court for Prince George's County, Plaintiff filed two lawsuits in this Court against Capital One and law firm Samuel I. White, P.C. ("SIWPC"), attorneys from which were the substitute trustees Capital One had appointed. In the first action, filed on August 12, 2013, Plaintiff alleged that both defendants violated RESPA by failing to act on requests he had sent with respect to his account and that SIWPC violated the MCDCA by unlawfully threatening foreclosure. *See Best v. Samuel I. White, P.C.*, No. WDQ-13-2348, 2014 WL 2575771, at *1 (D. Md. June 6, 2014). The Court granted the defendants' motion to dismiss after holding that Plaintiff's inquiries did not trigger duties under RESPA and declining to exercise supplemental jurisdiction over the remaining state law claim. *Id.* at *2–*3.

---

[1] In his counterclaims, Plaintiff asserted that Capital One had refused his request to provide him documentation establishing that it was the holder or owner of his Note and had unlawfully threatened foreclosure and made misleading statements in earlier correspondence, among other allegations. *Driscoll*, 2015 WL 5933669, at *1–*2.

In the second action, filed on October 24, 2013, Plaintiff alleged that SIWPC and Capital One violated the FDCPA and the MCDCA by misrepresenting their ability to foreclose within a certain time period. *See Best v. Samuel I. White, P.C.*, No. WDQ-13-3164, 2014 WL 2002448, at *1 (May 14, 2014). The Court granted the defendants' motion to dismiss, concluding that the communications Plaintiff raised had complied with Maryland law. *Id.* at *2.

On March 8, 2016, attorneys with Defendant B&S, who had been appointed as substitute trustees to replace the SIWPC trustees, filed a foreclosure action in the Circuit Court for Prince George's County, Maryland. *BSPLLC v. Best*, No. CAEF16-07406 (Prince George's Cty. Cir. Ct.).[2] On October 21, 2016, Plaintiff filed a Motion to Stay and/or Dismiss and Request for Discovery, asserting that he was not in default on his loan and that Capital One was not the holder of his Note and therefore lacked authority to appoint substitute trustees. The Circuit Court denied the motion by Order on November 22, 2016.

On November 29, 2016, Plaintiff filed a Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the District of Maryland. Voluntary Petition, *In re Dawud Best*, No. 16-25664 (Bankr. D. Md. Nov. 29, 2016) ("First Bankruptcy Case"), ECF No. 1. On February 2, 2017, Plaintiff initiated the *Best III* action in this Court, naming Fannie Mae, Capital One, and B&S for alleged violations of several federal and Maryland statutes over the preceding years. On March 8, 2017, the Bankruptcy Court issued an Order of Discharge in the First Bankruptcy case, granting a discharge under 11 U.S.C. § 727. First Bankruptcy Case (Mar. 8, 2017), ECF No. 45. The Bankruptcy Court then issued a Final Decree closing the case. First Bankruptcy Case (Mar. 8, 2017), ECF No. 46. On December 21, 2017, this Court granted Plaintiff's Motion for Leave to file a Second Amended Complaint in *Best III*. *Best III*, ECF Nos. 31, 32.

---

[2] The Court takes judicial notice of the docket and filings in this case. *See Strickland-Lucas v. Citibank, N.A.*, 256 F. Supp. 3d 616, 623 (D. Md. 2017).

On August 9, 2018, Plaintiff filed a second Chapter 7 bankruptcy petition. Voluntary Petition, *In re Dawud Best*, No. 18-20533 (Bankr. D. Md. Aug. 9, 2018) ("Second Bankruptcy Case"), ECF No. 1. On October 4, 2018, however, the Bankruptcy Court dismissed the case for failure to file required documents. Second Bankruptcy Case, ECF No. 32. On December 31, 2018, Plaintiff filed an Emergency Motion For A Temporary Restraining Order and/or Request for Preliminary Injunction in the foreclosure action in the Circuit Court for Prince George's County. The Motion was denied on January 3, 2019.[3] The same day, Plaintiff filed a third Chapter 7 petition, Voluntary Petition, *In re Dawud Best*, No. 19-10100 (Bankr. D. Md. Jan. 3, 2019) ("Third Bankruptcy Case"), ECF No. 1, but that case was also dismissed for failure to file documents the court ordered Plaintiff to submit, Third Bankruptcy Case, ECF No. 16. Plaintiff filed his Complaint in this action on August 14, 2019. ECF No 1.

Summary judgment briefing in *Best III* was completed in October 2019, and the Court issued its opinion on March 30, 2020, granting summary judgment for the defendants on the majority of Plaintiff's claims and dismissing Fannie Mae, but denying summary judgment as to some aspects of Plaintiff's claims under the FDCPA against B&S and as to Plaintiff's claim under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, against Capital One. *Best III*, 2020 WL 1503676, at *25. The Court found Plaintiff had demonstrated a genuine dispute of material fact as to whether B&S had fully complied with the FDCPA in foreclosure-related correspondence with Plaintiff and that Plaintiff had adequately demonstrated emotional harms to proceed with his claims under the statute. *Id.* at *11, *13, *16, 17. The Court also found a genuine dispute regarding whether Capital One breached ECOA's implementing regulations by failing to respond to certain inquiries from Plaintiff. *Id.* at *21–*22.

---

[3] The Maryland Court of Special Appeals affirmed the denial on May 6, 2020. *Best v. Frazier*, No. 3503, Sept. Term 2018, 2020 WL 2192360 (Md. App. May 6, 2020).

**B.  Facts Alleged in the CFAC**

After making general allegations about Plaintiff's loan and the February 2016 correspondence that was at issue in *Best III*, the CFAC picks up chronologically where the facts in *Best III* left off and introduces the new Defendant "NEWREZ, formerly known as New Penn Financial, LLC, and doing business under the name Shellpoint Mortgage Servicing." ECF No. 20 ¶¶ 5, 8–12.[4] Plaintiff first alleges that he submitted a complete loss mitigation application for his loan to Capital One in November 2017. *Id.* ¶ 13. Next, in June 2018, Plaintiff alleges that Shellpoint "claimed to have acquired the servicing of Plaintiff's loan," at which time the loan was treated as being in default. *Id.* ¶ 14.

However, Shellpoint's initial communication to Plaintiff failed to disclose the identity of the original creditor or the current creditor, the total amount owed on the debt, and Plaintiff's rights under the FDCPA to request verification or validation and to dispute the debt. *Id.* ¶ 15. Over the next year, Plaintiff sent a series of letters to Shellpoint dated July 19, 2018, August 2, 2018, August 6, 2018, September 5, 2018, November 14, 2018, November 16, 2018, November 26, 2018, December 24, 2018, January 2, 2019, March 19, 2019, and April 9, 2019. *Id.* ¶ 16.

While the CFAC is unclear, it appears to allege that the first of these letters was a Qualified Written Request ("QWR") to Shellpoint in which Plaintiff sought an update on his November 2017 loss mitigation application to Capital One. *Id.* ¶ 17.[5] The letter also requested information about Plaintiff's Note, including any endorsements, the identity of the loan's owner "and the master servicer," the loan's transaction history, a payoff and reinstatement quote, and

---

[4] The Court notes that some of Plaintiff's claims are asserted against both "NewRez" and "Shellpoint," *see* ECF No. 20 ¶¶ 69–71, 81, 102–04, despite Plaintiff's allegations in identifying the parties that Shellpoint is simply NewRez's trade name, *id.* ¶ 5. Because Plaintiff provides no specific allegations that NewRez and Shellpoint are separate entities, and because only NewRez LLC is currently a Defendant in this action, the Court will treat the two as a single unit and will refer to them as "Shellpoint."

[5] As the Court describes in detail below, a QWR is a communication to a loan servicer that triggers certain duties for the servicer. *See* 12 U.S.C. § 2605(e)(1)(B).

6

invoices for fees Shellpoint had identified as "Property Inspection Disbursement/Payment" and "FC Costs or Miscellaneous – nr Payment." *Id.* ¶ 18. Shellpoint did not acknowledge receipt of the letter within five days or provide a payoff statement within seven days. *Id.* ¶ 19.

Shortly after Shellpoint received the alleged QWR, B&S mailed a notice to Plaintiff stating that a foreclosure sale had been scheduled. *Id.* ¶ 20. The CFAC alleges that a foreclosure sale could not lawfully take place at that time because Plaintiff's November 2017 loss mitigation application was pending and had been received more than 37 days prior to the scheduled sale, and because Shellpoint was required to treat Plaintiff's July 19 letter as a debt dispute triggering a duty to verify the debt prior to scheduling or conducting a foreclosure sale. *Id.* ¶¶ 21, 25. Plaintiff further alleges that B&S knew that Shellpoint had not finished processing the November 2017 loss mitigation application and that it thus could not proceed with a sale. *Id.* ¶ 23.

Plaintiff then sent two more alleged QWRs to Shellpoint seeking answers to the inquiries he made in the first alleged QWR. *Id.* ¶ 24. When the foreclosure sale was not cancelled, however, "Plaintiff was forced to file a Chapter 7 Bankruptcy," which led to the cancellation of the sale. *Id.* ¶¶ 26–27. Plaintiff then submitted an allegedly complete loss mitigation application to Shellpoint on August 10, 2018, and another on January 2, 2019. *Id.* ¶ 28. Shellpoint then answered Plaintiff's first alleged QWR but responded only to the inquiry about ownership of Plaintiff's loan, which it stated was held by an entity identified as "FNMA New Res AA 322040091." *Id.* ¶¶ 29–30. Plaintiff had not received any notice that ownership of his loan had changed and researched the new owner but was unable to verify its existence. *Id.* ¶ 32.

Shellpoint eventually sent an additional letter purporting to respond to some of Plaintiff's inquiries and requests. *Id.* ¶ 33. In the new letter, Plaintiff alleges that "Shellpoint claimed that New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing was the current the owner of the

loan [sic] and that Shellpoint serviced the loan." *Id.* ¶ 34. Shellpoint did not provide information

Plaintiff had requested about his Note or identify the loan's "master servicer." *Id.* ¶ 35.

Shellpoint further stated that the loss mitigation application Plaintiff had submitted to Capital

One was not approved. *Id.* ¶ 36. Though Shellpoint provided correspondence purportedly from

Capital One that Shellpoint claimed showed the denial of the application, the correspondence did

not contain a statement of denial nor offer an opportunity to appeal a final denial decision. *Id.*

¶ 36. Plaintiff alleges that Shellpoint knew the application was complete but falsely represented

that it was not in order to proceed with an illegal foreclosure sale. *Id.*

B&S then mailed Plaintiff a second notice of a forthcoming foreclosure sale scheduled

for November 29, 2018. *Id.* ¶¶ 37, 89. In response, Plaintiff mailed another alleged QWR to

Shellpoint seeking information about his pending loss mitigation application and requesting that

the foreclosure sale be cancelled because of the unlawful "dual tracking" of the application.[6] *Id.*

¶ 38. After Shellpoint received the alleged QWR, B&S cancelled the sale on Shellpoint's

instruction. *Id.* ¶ 39. Plaintiff alleges that both Shellpoint and B&S knew that a foreclosure sale

would be unlawful because Plaintiff's loss mitigation application had not been fully processed.

*Id.* ¶¶ 39–40.

After the cancellation of the second scheduled sale, Plaintiff attempted to mail a letter to

FNMA New Res AA 322040091 seeking information about the entity and confirmation that it

owned his loan, but the letter was returned because the addressee was unknown. *Id.* ¶ 41.

Plaintiff then mailed Shellpoint another alleged QWR seeking information regarding his Note

and notifying it of his unsuccessful attempt to contact the FNMA entity. *Id.* ¶ 42.

---

[6] "Dual tracking occurs where a servicer moves towards foreclosure while the loss mitigation process is ongoing in violation of RESPA." *Brown v. Select Portfolio Servicing, Inc.*, No. GJH-18-1664, 2019 WL 1958547, at *3 (D. Md. May 2, 2019).

Plaintiff alleges that "Shellpoint failed to produce the requested information and documentation listed in Plaintiff's November 2018 QWR." *Id.* ¶ 43. Next, within 30 days of cancelling the second foreclosure sale, B&S scheduled a third for January 3, 2019. *Id.* ¶¶ 44, 89. Plaintiff immediately submitted an inquiry to Shellpoint asking why it scheduled a foreclosure sale when his loss mitigation application remained pending. *Id.* ¶ 45. Shellpoint responded that the application was incomplete and that Plaintiff needed to file a new application before the scheduled sale date. *Id.* ¶ 46. Plaintiff alleges that Shellpoint gave him an outdated application form called the Uniform Borrower's Assistance Form ("UBAF"), which Plaintiff nonetheless completed and submitted to Shellpoint immediately. *Id.* ¶ 47.

On January 2, 2019, Plaintiff also submitted to Shellpoint "an up-to-date Mortgage Assistance Application ('MAAp')," which Plaintiff alleges replaced the UBAF on June 1, 2018 and has simpler requirements. *Id.* ¶¶ 48–50. Plaintiff alleges that Shellpoint is aware that loan servicers were required to provide the MAAp to borrowers beginning on June 1, 2018 but that it nonetheless failed to provide it to Plaintiff. *Id.* ¶ 50. B&S then scheduled a fourth foreclosure sale for March 28, 2019, despite Shellpoint's knowledge that none of Plaintiff's loss mitigation applications had been fully processed. *Id.* ¶ 51.

Plaintiff then mailed another alleged QWR to Shellpoint requesting that Shellpoint state whether it authorized the foreclosure sale and, if so, to explain the reason it had been scheduled during the loss mitigation process. *Id.* ¶ 52. The fourth foreclosure sale was then cancelled. *Id.* ¶ 53. Finally, Plaintiff sent another alleged QWR reiterating his questions from earlier QWRs. *Id.* ¶ 54. Shellpoint acknowledged receipt and expressed that it would need additional time to respond fully. *Id.* ¶ 55. Shellpoint later informed Plaintiff, however, that it would not conduct another investigation because it had already responded to a similar letter. *Id.* ¶ 56.

9

Plaintiff finally alleges that Shellpoint continued sending him mortgage statements through the month of May 2019, but that he has not received another statement since that month. *Id.* ¶ 104 n.1. The statements allegedly included several sections and components that Plaintiff describes. First, Plaintiff alleges that the statements "included a section entitled 'Explanation of Payment Amount,' which included a 'Regular Monthly Payment' amount and a 'Total Payment Amount,' both in bold lettering." *Id.* ¶ 113. Also included was "a detachable 'Payment Coupon' to send in with the payment, which was referred to as the 'Payment Amount' and had a 'Payment Date.'" *Id.* Also present, however, was "a section titled 'Bankruptcy Message' with an impersonal form notice that the statement is for information purposes only." *Id.* ¶ 114.

Plaintiff further alleges that an explanatory section of the statements titled "Understanding Your Monthly Statement" stated that the "Payment Amount . . . [p]rovides the minimum payment due for the stated month and states the date that payment is due," while "Explanation of Payment Amount . . . [d]isplays a summary of the payment amount due." *Id.* The statements also explained that the "'Payment Coupon . . . should be detached and returned with [Plaintiff's] payment." *Id.* None of the monthly statements, Plaintiff alleges, "nor any other communication from Shellpoint, included any explanation that [Plaintiff] would only have to pay the amounts requested if he wanted to retain ownership of the property." *Id.* ¶ 115.

Plaintiff concludes that "[e]ither Shellpoint never properly processed [Plaintiff's] bankruptcy filing and discharge and therefore, continues to attempt to collect on the discharged debt, or it deliberately chose to ignore the effect of the discharge." *Id.* ¶ 116. Plaintiff adds that "[u]pon information and belief, Shellpoint does not have proper policies and procedures in place to correctly process and treat loans that have been discharged." *Id.* ¶ 117.

### C.  Procedural History

As noted, Plaintiff filed his initial Complaint in this action on August 14, 2019. ECF No. 1. B&S filed a Motion to Dismiss the Complaint on October 18, 2019, ECF No. 12, while Shellpoint and Fannie Mae filed a Motion to Dismiss on October 21, 2019, ECF No. 14. Both motions were preceded by consent motions for extensions of time to file responses to the Complaint. ECF Nos. 10, 11. Those motions remain pending and will be granted, while the Motions to Dismiss will be denied as moot because the Complaint was superseded without objection by the First Amended Complaint Plaintiff filed on November 12, 2019, ECF No. 19, and the CFAC, ECF No. 20, filed the following day.

On November 26, 2019, Shellpoint and Fannie Mae filed a Consent Motion for Leave to File Excess Pages, ECF No. 21, and a Motion to Dismiss the CFAC, ECF No. 22. Plaintiff filed a Consent Motion for Extension of Time to respond to the Motion to Dismiss on December 9, 2019. ECF No. 23.[7] B&S filed a Motion to Dismiss the CFAC on December 10, 2019. ECF No. 24. Plaintiff filed a joint opposition to both Motions to Dismiss on December 30, 2019. ECF No. 25. Fannie Mae and Shellpoint filed a Reply on January 27, 2020, ECF No. 28, and B&S filed a Reply on the following day, ECF No. 29.

On May 28, 2020, Plaintiff filed a Motion for Leave to file a Second Amended Complaint, ECF No. 30, and attached a proposed Second Amended Complaint ("SAC"), ECF No. 30-3. On June 22, 2020, B&S filed a Motion to Dismiss the proposed SAC, ECF No. 33, while Fannie Mae and Shellpoint filed an Opposition to the Motion for Leave, ECF No. 34. On July 6, 2020, Plaintiff filed a Motion for Extension of Time to file a Reply to Fannie Mae and Shellpoint's Opposition, ECF No. 35, and a separate Motion for Extension of Time to file an

---

[7] Both Consent Motions, ECF Nos. 21, 23, remain pending and will be granted.

Opposition to B&S's Motion to Dismiss the SAC, ECF No. 36.[8] On July 13, 2020, Plaintiff filed

a Reply to Fannie Mae and Shellpoint's Opposition to his Motion for Leave, ECF No. 37, and a

Response in Opposition to B&S's Motion to Dismiss the SAC, ECF No. 38.

### D.  Proposed Second Amended Complaint

The proposed SAC makes no changes to the paragraphs of the CFAC stating Plaintiff's

claims and simply adds factual allegations concerning events after the filing of the CFAC.

According to the proposed SAC, in or about November 2019, Plaintiff received correspondence

from Shellpoint demanding that he pay $500 for "Attorney Cost Disbursement" and $189.79 for

"REO LP Hazard Disbursement," the former of which "appeared to be totally unjustified." ECF

No. 30-3 ¶¶ 58–59. In a letter to Shellpoint dated December 21, 2019, Plaintiff inquired about

the charges and requested that information substantiating them be provided within 15 days. *Id.* ¶

60. Shellpoint did not respond. *Id.* ¶ 61. Plaintiff alleges that Shellpoint declined to answer his

inquiry about the attorney cost disbursement "because it could not justify" the charge.

Instead, a foreclosure sale was scheduled for February 2020. *Id.* ¶ 63. Plaintiff alleges

that the sale was unlawful because Shellpoint had not fully processed Plaintiff's loss mitigation

application and failed to provide Plaintiff with notice of the sale. *Id.* ¶ 64. Instead, Plaintiff

learned of the sale when he received an advertisement from an attorney. *Id.* ¶ 65. Plaintiff called

Shellpoint and B&S to inform them that the sale was illegal, but they declined to stop it, though

it was eventually cancelled "at the very last minute." *Id.* ¶¶ 66–67. Another foreclosure sale was

then scheduled for March 2020. *Id.* ¶ 68. Plaintiff maintains that this sale was also unlawful

because his loss mitigation application had still not been fully processed. *Id.* ¶ 69. Nonetheless,

---

[8] Both Motions remain pending and will be granted.

the sale proceeded and the property was sold at auction to an investor on a date that Plaintiff has not specified. *Id.* ¶ 70.

## II.      STANDARD OF REVIEW

To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). The Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must also "draw all reasonable inferences in favor of the plaintiff." *Id.* at 253 (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

## III.     DISCUSSION

As noted previously, B&S has moved to dismiss each of Plaintiff's complaints, including the proposed SAC, ECF No. 33, while Shellpoint and Fannie Mae have moved to dismiss the earlier pleadings but have opposed Plaintiff's Motion for Leave to File a Second Amended Complaint, ECF No. 34. The Court first considers B&S's motions before turning to the Motion for Leave and Shellpoint and Fannie Mae's pending motions.

**A.  B&S Motions to Dismiss**

The Court need not linger on B&S's Motions to Dismiss because despite repeated opportunities, Plaintiff has failed to identify B&S as responsible for any of the wrongdoing alleged in his pleadings. As B&S correctly observed in its first Motion to Dismiss, the original Complaint did not mention or name B&S in making out any of the six claims asserted. ECF No. 12-1 at 2. Plaintiff did not remedy this issue in the CFAC, ECF No. 20, which he filed nearly a month after B&S's Motion to Dismiss alerted him to the deficiency. In his Opposition to the Motions to Dismiss the CFAC, Plaintiff claimed that "B&S was mistakenly omitted from the cause of action section" of the CFAC but that "the CFAC provides the factual predicate for FDCPA and MCDCA claims against B&S." ECF No. 25 at 3 n.1.

Plaintiff offers no other support for that assertion. Indeed, Plaintiff did not rectify the omission in the CFAC, nor in the proposed SAC, which like the preceding pleadings is devoid of any specific allegations of unlawful conduct by B&S. *See* ECF No. 30-3 at 8–19. Instead, in response to B&S's Motion to Dismiss the proposed SAC, Plaintiff again claims that the omission of B&S "from the allegations in the Counts I & II [sic] of the Second Amended Complaint" was a "technical mistake and not a basis for dismissal." ECF No. 38 at 1. Plaintiff thus proposes that he be granted leave to file a Corrected Second Amended Complaint. *Id.*

The Court will deny this request. Between the original Complaint, the First Amended Complaint, the CFAC, and the proposed SAC, Plaintiff has had four opportunities to properly assert claims against B&S, and has failed to do so each time. The Court will not grant Plaintiff a fifth bite at the proverbial apple to properly assert claims against a defendant when Plaintiff was aware of the glaring deficiency in his pleading for more than seven months. *Cf. Peterson v. M.J.J., Inc.*, No. JKB-16-3629, 2017 WL 4098755, at \*5–\*6 (D. Md. Sept. 13, 2017) (denying a

motion for leave to file a second amended complaint where "Plaintiffs had a defective complaint from the beginning, and Defendants pointed this out in their first motion to dismiss").

To do so would prejudice B&S by requiring it to file a fourth response to a pleading in this case, despite its good faith notices to Plaintiff in each of its prior filings that Plaintiff failed to properly assert any claims against it. While Federal Rule of Civil Procedure 15(a) directs that leave to amend a pleading should freely be given, courts may deny leave for several reasons, including "repeated failure to cure deficiencies by amendments previously allowed." *Kravitz v. U.S. Dep't of Commerce*, 355 F. Supp. 3d 256, 271–72 (D. Md. 2018) (quoting *Foman v. Davis*, 361 U.S. 178, 182 (1962)). Plaintiff here has failed to cure known deficiencies despite several opportunities and invitations. For these reasons, the Court will grant B&S's Motion to Dismiss the CFAC, ECF No. 24, and will deny as moot B&S's Motion to Dismiss the Plaintiff's Complaint and Motion to Dismiss the Plaintiff's 2nd Amended Complaint, ECF Nos. 12, 33.

### B.  Motion for Leave to File Second Amended Complaint

The Court next turns to Plaintiff's Motion for Leave to file the proposed SAC. As noted previously, Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to parties to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). The Fourth Circuit has "interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" *Id.* (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)); *see also Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012).

Shellpoint and Fannie Mae (collectively, "Defendants") argue that Plaintiff's Motion for Leave should be denied because the Motion was not brought in a diligent manner, the proposed SAC and this action in general are not brought in good faith, granting leave to amend would prejudice Defendants, and the proposed amendment is futile. ECF No. 34 at 1. The Court considers these arguments in turn.

Defendants argue first that there is no explanation besides dilatory motive for Plaintiff's decision not to move for leave to amend until May 2020, given that the correspondence described in the proposed SAC was sent in late 2019 and the foreclosure sales were scheduled in February and March 2020. *Id.* at 4–5. Defendants cite case law stating that "[u]ndue delay constitutes legitimate grounds for a district court's decision to deny a request for leave to amend." *Davis v. United States*, Nos. PJM-00-0424, PJM-04-3291, 2007 WL 2059845, at *2 (D. Md. July 12, 2007) (citing *Foman*, 371 U.S. at 182). As Plaintiff correctly responds, however, "[d]elay alone is an insufficient reason to deny leave to amend." *McCall-Scovens v. Blanchard*, No. ELH-15-3433, 2016 WL 6277668, at *4 (D. Md. Oct. 27, 2016) (quoting *Edwards*, 178 F.3d at 242). "Rather, the delay must be accompanied by prejudice, bad faith, or futility." *Id.* (quoting *Edwards*, 178 F.3d at 242).

Defendants next argue that the proposed SAC and this lawsuit are not brought in good faith because "the correspondence at the heart of Plaintiff's claims are not intended to actually glean information" but rather "to try to trap a defendant into a potential violation of some consumer protection statute." ECF No. 34 at 7. To be sure, Plaintiff's long history of correspondence and litigation involving his mortgage has undoubtedly required Defendants and their predecessors to expend significant resources defending against mostly unmeritorious claims. But Defendants are required to abide by laws designed to protect homeowners or risk the

16

potential consequences designed by those laws, regardless of Plaintiff's motivations in seeking the information.

With respect to prejudice, Defendants point again to Plaintiff's lengthy litigation history and the multiple motions to dismiss they have already filed in this case, arguing that "there is no compelling reason to require Defendants to incur additional time and money in moving to dismiss the proposed Second Amended Complaint." ECF No. 34 at 6. This argument is unpersuasive for two reasons. First, as Plaintiff observes, "'the time, effort, and money . . . expended in litigating [a] case' do not constitute 'substantial prejudice'" weighing against leave to amend. *Class Produce Group, LLC v. Harleysville Worcester Ins. Co.*, No. ELH-16-3431, 2017 WL 2377105, at *9 (D. Md. May 31, 2017) (quoting *Nat'l Recovery Agency v. AIG Domestic Claims, Inc.*, No. 4:05-CV-0033, 2006 WL 1289545, at *3 (M.D. Pa. May 9, 2006)).

Second, Defendants incorrectly presume that they would be required to file a third motion to dismiss with respect to the proposed SAC. Defendants have opposed the Motion for Leave on futility grounds, effectively bringing a preemptive motion to dismiss the new proposed pleading. "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (quoting *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)) (explaining that the plaintiff's proposed amendment was futile if the new claim it added would not have survived a Rule 12(b)(6) motion to dismiss). Accordingly, Defendants would not need to file an additional motion were the Court to grant the Motion for Leave and therefore would not be prejudiced.

Because Defendants' other objections to the Motion for Leave lack independent merit, the Court will turn to Defendants' claims of futility. Because evaluating futility requires assessing whether the proposed additions in an amended pleading render the pleading sufficient

to defeat a motion to dismiss, the Court can simultaneously consider Defendants' Motion to Dismiss the CFAC and Defendants' Opposition to the Motion for Leave. As an initial note, Defendants protest in their Opposition that none of the allegations in the proposed SAC are expressly tied to any of Plaintiff's specific claims, "leaving Defendants (and the Court) to guess which allegations are supposed to support which cause of action." ECF No. 34 at 3.

Plaintiff responds that several claims in his prior pleadings also did not explicitly reference particular factual allegations and that Defendants were nonetheless able to discern which facts were at issue in each of the claims. ECF No. 37 at 3. While the Court strongly encourages parties to file pleadings with the maximum degree of clarity and detail, Plaintiff's observation is accurate. Additionally, in his Reply, Plaintiff identifies the factual allegations in the proposed SAC that correspond to specific paragraphs of each of his claims. *Id.* While Plaintiff cannot amend a pleading through any filing other than an amended complaint, the Court will consider Plaintiff's clarifications in its analysis. *See Cezair v. JPMorgan Chase Bank, N.A.*, No. DKC 13-2928, 2014 WL 4295048, at *8 (D. Md. Aug. 29, 2014) (considering clarifications to a pleading offered in an opposition to a motion to dismiss).

### C. Futility of Amendment and Motion to Dismiss the CFAC

The Court now considers each of the claims asserted against Defendants in the CFAC and the proposed SAC, beginning with Plaintiff's FDCPA claims.

#### 1. FDCPA Claims

Plaintiff's FDCPA claims are asserted in Counts One and Six of the CFAC and proposed SAC.[9] "The FDCPA protects consumers from 'abusive debt collection practices' by debt

---

[9] As Defendants note, each version of Plaintiff's pleadings has had two claims labeled "Count Four," resulting in "Count Six" actually being the seventh count. ECF No. 22-1 at 31 n.9. The Court will avoid referring to the counts by number except when referring to the FDCPA claims.

collectors." *Farber v. Brock & Scott, LLC*, No. TDC-16-0117, 2016 WL 5687042, at *5 (D. Md. Oct. 6, 2016) (quoting 15 U.S.C. § 1692(a)). A debt collector is "a person who 'regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.'" *Id.* (quoting 15 U.S.C. § 1692a(6)). Counts One and Six of the CFAC allege that various actions by Shellpoint violated several provisions of the FDCPA. The Court first reviews the provisions at issue before considering Plaintiff's claims.

Plaintiff raises subsections of two substantive FDCPA provisions: 15 U.S.C. §§ 1692e and 1692f.[10] § 1692e states that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." The statute's subsections provide a non-exhaustive list of prohibited debt collector conduct. *See Sterling v. Ourisman Chevrolet of Bowie Inc.*, 943 F. Supp. 2d 577, 585 (D. Md. 2013). § 1692e(2) bars "[t]he false representation of" either "(A) the character, amount, or legal status of any debt; or (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt." § 1692e(5) "prohibits a debt collector from making a 'threat to take any action that cannot legally be taken or that is not intended to be taken.'" *Cooke v. Carrington Mortg. Servs.*, No. TDC-18-0205, 2019 WL 3241128, at *3 (D. Md. July 18, 2019) (quoting 15 U.S.C. § 1692e(5)). Finally, § 1692e(10) prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *Id.* (quoting 15 U.S.C. § 1692e(10).

Similar to the preceding section, "Section 1692f condemns the use of 'unfair or unconscionable means to collect or attempt to collect any debt,' and provides a non-exhaustive

---

[10] The CFAC also asserts claims under 15 U.S.C. § 1692g. ECF No. 20 ¶¶ 15, 19. However, in his Opposition to the motions to dismiss the CFAC, Plaintiff concedes that the § 1692g claims are time-barred. ECF No. 25 at 3–4. While the proposed SAC maintains the § 1692g claims from the CFAC, ECF No. 30-3 ¶¶ 15, 72, in light of Plaintiff's admission of untimeliness, the Court will assume this was an error and will not consider those claims.

list of proscribed conduct. Subsection (1) . . . prohibits '[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.'" *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 235 (4th Cir. 2015) (citation omitted) (quoting 15 U.S.C. § 1692f(1)). § 1692f(6) "prohibits, in relevant part, '[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest.'" *Cooke*, 2019 WL 3241128, at *5 (quoting 15 U.S.C. § 1692f(6)).

### i.   Count One FDCPA Claims

Plaintiff asserts three types of FDCPA claims in Count One. First, he alleges that Shellpoint violated §§ 1692e(2), 1692e(5), 1692e(10), and 1692f(1) by collecting or threatening to collect various inflated or unjustifiable fees. ECF No. 20 ¶ 60. These include "legal fees that were either not incurred or not authorized by the loan or deed of trust, fees and charges attendant to illegal actions, uncollectible interest, excessive fees relating to maintenance or preservation, unnecessary and/or redundant evaluations or estimates, unidentified and hidden fees that were assessed for services not performed, not needed or grossly inflated." *Id.*

Defendants argue that these allegations fail to state a claim because Plaintiff has not identified the actual fees in dispute and has provided no factual allegations to support his position that any such fees were unjustified, inflated, or otherwise not recoverable under the operative Deed of Trust. ECF No. 22-1 at 14. Plaintiff responds that the attempts to collect fees were made in the mortgage statements that Shellpoint allegedly sent him through May 2019 and that "it can be inferred that Shellpoint and/or B&S attempted and/or threatened to collect on these inflated and/or unjustifiable fees in its mortgage statements and notice of foreclosure sales

that were also sent to Plaintiff." ECF No. 25 at 4 (citing ECF No. 20 ¶¶ 104 n.1, 113). Plaintiff

further states that he "alleged, or it can be inferred that Shellpoint attempted to collect on these

inflated and/or unjustifiable fees in its correspondence." *Id.*

Plaintiff also asserts that Shellpoint's mortgage statements constitute attempts to collect a

debt and that its "attempts to collect inflated and unjustified fees in its mortgage statements are

violations of §§ 1692e(2), (10)." *Id.* at 4–5. But Defendants' argument is persuasive. Nowhere in

the CFAC does Plaintiff identify any specific fees that the mortgage statements allegedly

directed him to pay. More importantly, Plaintiff fails to explain how the unidentified fees were

improper or impermissible in any way, rendering his allegations conclusory and baseless. The

lack of any such specific allegations is fatal to Plaintiff's fee-related claims under §§ 1692e(2),

1692e(5), 1692e(10), and 1692f(1), and those claims will therefore be dismissed.

Count One next alleges that Shellpoint violated §§ 1692e(5), 1692e(10), and 1692f(6)

"by threatening to sell Plaintiff's property at a public foreclosure auction when they had no legal

right to sale [sic] the property," and "by threatening to hold a foreclosure auction sale without

completing Plaintiff's loss mitigation application that was received well-over 37 days prior to the

date of the scheduled foreclosure auction sale." *Id.* ¶¶ 61–62. Defendants first argue that no

claim can proceed under § 1692f(6) because that provision concerns unlawful nonjudicial

attempts to seize property, while Defendants' foreclosure attempts were the subject of judicial

proceedings in the Circuit Court for Prince George's County. ECF No. 22-1 at 16.

Plaintiff responds that because he did not allege that the Circuit Court "approved the

foreclosure sale," but rather that it was unlawful, "it can be inferred that the Circuit Court would

not approve of such a sale." ECF No. 25 at 8. Whether or not the Circuit Court would authorize a

foreclosure, artful pleading aside, does not itself render the attempted foreclosures that

Defendants sought before that court "nonjudicial action to effect dispossession or disablement of property." 15 U.S.C. § 1692f(6). However, "[a] foreclosure sale in Maryland is nonjudicial in the limited sense that the trustee under the deed of trust, rather than an officer appointed by the court, conducts the sale." *In re Zinn*, No. 13-14270-LSS, 2017 WL 262043, at *6 (Bankr. D. Md. Jan. 17, 2017).

Case law appears limited on the applicability of § 1692f(6) to Maryland foreclosures, though courts have noted the Maryland Court of Appeals' observation that "any simple characterization of Maryland's foreclosure statute as a nonjudicial one is 'slightly inaccurate,' and that the statute 'does not fall squarely within [the] concept of nonjudicial foreclosure.'" *McCray v. Samuel I. White, P.C.*, No. TDC-18-3491, 2019 WL 6895986, at *3 (D. Md. Dec. 18, 2019) (alteration in original) (quoting *Anderson v. Burson*, 35 A.3d 452, 460 n.14 (Md. 2011)). Regardless, Plaintiff's claim nonetheless fails here because § 1692f claims are permitted alongside § 1692e claims only when the facts alleged in support of the § 1692f claim are "separate" from those supporting the § 1692e claim. *Stewart v. Bierman*, 859 F. Supp. 2d 754, 765 (D. Md. 2012). Because Plaintiff here has "failed to allege 'any misconduct separate and distinct from the § 1692e claims,'" his § 1692f claim stemming from the same conduct will be dismissed. *Agomuoh v. PNC Fin. Servs. Grp.*, No. GJH-16-1939, 2017 WL 657428, at *13 (D. Md. Feb. 16, 2017) (quoting *Stewart*, 859 F. Supp. 2d at 765).

The remainder of the parties' arguments as to Count One concern Plaintiff's allegations about his alleged loss mitigation applications. Plaintiff does not identify the provisions he seeks to invoke with these allegations, but as Defendants observe, Plaintiff apparently intends to allege that Defendants' conduct with respect to his applications violated 12 C.F.R. § 1024.41, a provision of RESPA's implementing regulations, which are known as "Regulation X." *See*

*Brown v. Select Portfolio Servicing, Inc.*, No. GJH-18-1664, 2019 WL 1958547, at *3 (D. Md. May 2, 2019). 12 C.F.R. § 1024.41(c) provides that "if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application," the servicer "must evaluate the borrower for all loss mitigation options, provide the borrower with written notice of its options, if any, and notify the borrower in writing if its application has been rejected." *Cooke*, 2019 WL 3241128, at *4 (citing 12 C.F.R. § 1024.41(c)-(d)).

"'[A] servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale' unless it has notified the borrower that the loss mitigation application was denied and the borrower has exhausted its appeal rights." *Id.* (alteration in original) (quoting 12 C.F.R. § 1024.41(g)). In *Cooke v. Carrington Mortgage Services*, Judge Chuang of this Court explained that "[b]ecause RESPA prohibits a foreclosure sale before such an application has been denied and all appeal rights exhausted, the scheduling of [a] sale could constitute a debt collector's 'threat' to take an action 'that cannot legally be taken' in violation of § 1692e(5)." *Id.* at *5 (quoting 15 U.S.C. § 1692e(5); 12 C.F.R. § 1024.41(g)).

It is on this basis that Plaintiff appears to premise his FDCPA claim concerning loss mitigation applications. The Court notes that Plaintiff cites no authority linking a violation of § 1024.41 to an FDCPA claim under § 1692e(10) rather than § 1692e(5), nor is the Court aware of any. However, it seems reasonable to conclude that the premature scheduling of a foreclosure sale in violation of Regulation X constitutes "the use of [a] false representation or deceptive means to collect or attempt to collect [a] debt," 15 U.S.C. § 1692e(10), particularly in light of the principle that the FDCPA should be interpreted expansively to consumers' benefit. *See Powell v.*

23

*Palisades Acquisition XVI, LLC*, 782 F.3d 119, 123–24 (4th Cir. 2014); *see also In re Dubois*, 834 F.3d 522, 527 (4th Cir. 2016).

In any case, Defendants argue that § 1024.41's requirements do not apply here because Plaintiff failed to provide Shellpoint with a complete loss mitigation application within 37 days prior to the scheduling of any of the foreclosure sales at issue. Defendants first address the earliest purported loss mitigation application described in the CFAC, which Plaintiff alleges that he submitted to Capital One, his previous servicer, in November 2017. ECF No. 22-1 at 17 (citing ECF No. 20 ¶ 13). The CFAC alleges that B&S mailed a notice to Plaintiff's residence stating that a foreclosure sale had been scheduled while that application remained pending, barring any sale. ECF No. 20 ¶¶ 20–21.

As Defendants correctly observe, however, Plaintiff never alleges when this first foreclosure sale was scheduled, but does allege that he filed a bankruptcy petition to stop the sale. ECF No. 22-1 at 17 (citing ECF No. 20 ¶ 26). "As a consequence of the Bankruptcy filing," the CFAC asserts, the foreclosure sale was canceled," and "[t]hereafter, Plaintiff resubmitted a complete loss mitigation application to Shellpoint . . . on 08/10/2018." ECF No. 20 ¶¶ 27–28. As described previously, Plaintiff filed a Chapter 7 bankruptcy petition on August 9, 2018. Voluntary Petition, Second Bankruptcy Case (Bankr. D. Md. Aug. 9, 2018), ECF No. 1.

Reading Plaintiff's allegations with the docket in that bankruptcy case leads to the conclusion that the first foreclosure sale Plaintiff discusses here was scheduled some time before August 9, 2018. Plaintiff initiated this action on August 14, 2019, more than one year later. ECF No. 1. Accordingly, under the FDCPA's one-year statute of limitations, 15 U.S.C. § 1692k(d), claims concerning the scheduling of that foreclosure sale are time-barred. *See Fontell v. Hassett*,

870 F. Supp. 2d 395, 403 (D. Md. 2012) (noting the FDCPA statute of limitations). This aspect

of Plaintiff's FDCPA claims will therefore be dismissed.

The parties next discuss the loss mitigation application that Plaintiff allegedly submitted

to Shellpoint on August 10, 2018. ECF No. 20 ¶ 28. The CFAC alleges that B&S mailed Plaintiff

a second notice of foreclosure sale while that application remained pending. *Id.* ¶¶ 37, 89.

Defendants protest that they again "are left to guess as to when this Second Foreclosure Sale was

scheduled to occur as no date is provided in the Amended Complaint." ECF No. 22-1 at 18.

Defendants thus argue that the pleading fails to adequately put Defendants on notice of the claim.

*Id.* Defendants additionally claim that Plaintiff's allegation is refuted by an exhibit to their

Motion, a letter from Shellpoint to Plaintiff dated August 14, 2018 in which Shellpoint stated

that Plaintiff's loss mitigation application was incomplete. *Id.* (citing ECF No. 22-7).

Both of Defendants' arguments are unpersuasive. First, though a date is not given in the

FDCPA claims, the CFAC alleges within the allegations supporting the RESPA claim that a

foreclosure sale was scheduled for November 29, 2018. ECF No. 20 ¶ 89. Even if that were not

the date of the second foreclosure sale Plaintiff refers to, however, Defendants' argument that

they lack adequate notice of the date is difficult to credit. As Plaintiff's mortgage servicer and

the entity attempting to foreclose on his property, Shellpoint presumably possesses records of the

foreclosure sales that were scheduled. It is difficult to conclude that Defendants need additional

information to adequately comprehend Plaintiff's claim.

Second, with respect to the August 14 letter exhibit, Defendants correctly argue that at

the motion to dismiss stage, courts are not obligated to accept allegations that "contradict matters

properly subject to judicial notice or by exhibit." *Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F.

Supp. 3d 422, 433 (D. Md. 2015) (quoting *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014)).

But it is not clear either that Defendants' exhibit refutes Plaintiff's allegations or that the letter is properly before the Court at this stage. "Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019) (citing *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). "In particular, a court may consider documents that are 'explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . .'" *Id.* (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)).

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166. "To be 'integral,' a document must be one 'that by its very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Brennan*, 361 F. Supp. 3d at 502 (quoting *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)). "For instance, courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that 'constitute the core of the parties' contractual relationship" in a breach of contract dispute." *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. JFM 10-CV-0206, 2010 WL 2732334, at *2 (citing *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)).

The August 14 letter was not attached to or expressly incorporated, nor even acknowledged, in the CFAC. Thus, to be eligible for consideration by the Court at this stage, the letter would have to be integral to the CFAC. Defendants argue generally that "[t]he Amended Complaint relies heavily on a variety of communications" and state without elaboration that their

26

exhibits "are integral to the claims at issue." ECF No. 22-1 at 12 n.7. But Defendants have failed to so demonstrate with respect to the August 14 letter. As a comparison to cases in which documents have been found integral makes clear, *see Fisher*, 2010 WL 2732334, at *2, the letter's existence does not give rise to the legal rights asserted in the FDCPA claims, which derive from Plaintiff's alleged loss mitigation applications. Accordingly, Defendants must await a subsequent stage of this litigation to raise the August 14 letter with the Court.

Even if the Court did consider the document now, however, it is unclear whether it refutes Plaintiff's allegations. The letter's list of "documentation" that Plaintiff's application lacked consists of a single item: "First trial period mortgage payment of $2,146.85." ECF No. 22-7 at 2. It is unclear to the Court how a payment for an apparent trial modification of Plaintiff's loan rendered incomplete a loss mitigation application sent four days earlier. While the August 14 letter may eventually defeat Plaintiff's claims, it would be premature for the Court to make that conclusion now based solely on the CFAC and a non-integral and ambiguous exhibit. For these reasons, Plaintiff's FDCPA claim concerning the scheduling of a foreclosure sale following his August 10, 2018 loss mitigation application may proceed.

The Court now pauses to clarify the timeline alleged in the CFAC and the claims Plaintiff draws from specific events alleged. The CFAC asserts that the second scheduled foreclosure sale was cancelled but that within thirty days, B&S scheduled a third sale for January 3, 2019. ECF No. 20 ¶¶ 39, 44, 89. Plaintiff states that he submitted an inquiry seeking an explanation for the scheduling of the sale despite his pending application, and that Shellpoint responded saying that the application was incomplete and that Plaintiff needed to submit a new application, which it provided. *Id.* ¶ 46. Plaintiff alleges that he immediately completed and submitted the application that Shellpoint furnished, even though the form Shellpoint provided was obsolete. *Id.* ¶ 47.

Plaintiff then states that he submitted another application on the current form on January 2, 2019. *Id.* ¶ 48. Finally, Plaintiff alleges that B&S then scheduled a fourth foreclosure sale for March 28, 2019. *Id.* ¶¶ 51, 89.

Plaintiff does not explain what happened to the third scheduled sale, but the fact that a fourth was scheduled suggests that the third was cancelled. In any case, however, Plaintiff does not appear to derive any RESPA-based FDCPA claims from the events between the second scheduled sale and the submission of his January 2, 2019 loss mitigation application. Instead, his final RESPA-FDCPA claim appears to allege that Defendants scheduled the fourth foreclosure sale despite the pending January 2, 2019 loss mitigation application. Defendants argue that this claim must fail in the same manner as the claim arising from Plaintiff's August 10, 2018 application. ECF No. 22-1 at 18–19.

Defendants point to another letter exhibit in which Shellpoint appears to inform Plaintiff that his loss mitigation application is incomplete. *Id.* at 18–19 (citing ECF No. 22-8). But because Defendants again fail to demonstrate that the letter is integral to the CFAC, the letter is not properly before the Court. Accordingly, the Court will decline to consider it at this stage and will instead accept as true, as it must at this stage, Plaintiff's plausible allegation that his January 2, 2019 application was complete. Because Defendants make no other argument for dismissal of the claim arising from the January 2 application and the scheduling of the fourth foreclosure sale, this claim may also proceed.

### ii.   Count Six FDCPA Claims

In Count Six, Plaintiff alleges on behalf of a proposed class that Shellpoint violated "15 U.S.C. §§ 1692e, e(2), and e(10) by falsely representing that a discharged debt is owed when in fact it was not by virtue of the bankruptcy discharge injunction." ECF No. 20 ¶ 138.

"Specifically, by sending mortgage statement [sic] to members of the Putative Class, Shellpoint violated 15 U.S.C. §§ 1692e, e(2), and e(10) by falsely representing that members of the Putative Class owe money on a discharge debt notwithstanding members of the Putative Class's bankruptcy discharge." *Id.* ¶ 139. Defendants argue that Plaintiff's assertion of this claim is time-barred and that the mortgage statements Shellpoint sent did not unlawfully misinform Plaintiff. ECF No. 22-1 at 19.

With respect to timeliness, Defendants argue that Shellpoint began servicing Plaintiff's loan in June of 2018, as alleged in the CFAC, and that the first mortgage statement Shellpoint sent Best was dated June 22, 2018. *Id.* at 19 (citing ECF No. 20 ¶ 14). Defendants attach that statement as an exhibit. ECF No. 22-9. According to Defendants, because Plaintiff "was on notice of the claim more than one year before filing this action," in that his claim relies on statements including the June 22 statement, "any attempt to bring an FDCPA claim concerning the language in his periodic statements is time-barred." ECF No. 22-1 at 19 (citing 15 U.S.C. § 1692k(d)). Defendants assert that even if "some periodic statements containing the complained of language may have been sent within the statute of limitations period," that does not render timely an FDCPA claim arising from them when the first statement was sent outside the period. *Id.* at 20.

Plaintiff does not challenge Defendants' citation to the June 22, 2018 mortgage statement, and given that Count Six arises directly from the mortgage statements Shellpoint sent, the statements may properly be considered integral and thus may be reviewed by the Court at this stage. Plaintiff argues, however, that Defendant's timeliness argument is untenable because it would read the FDCPA to "give debt collectors a free pass at violating the FDCPA just because they have been violating the FDCPA for over a year." ECF No. 25 at 9. After briefing in this

case concluded, the Fourth Circuit issued a ruling agreeing with Plaintiff and rejecting Defendants' argument. *Bender v. Elmore & Throop, P.C.*, 963 F.3d 403, 407 (4th Cir. 2020)

In *Bender v. Elmore & Throop, P.C.*, the Fourth Circuit reversed a finding that because the first in a series of debt collection letters to the plaintiffs was sent more than a year before the plaintiffs filed suit, FDCPA claims arising from later letters sent within the statute of limitations were time-barred. *See id.* at 405–06. The Fourth Circuit first explained that it "long [has] held that a 'separate violation' of the FDCPA occurs 'every time' an improper communication, threat, or misrepresentation is made." *Id.* at 407 (quoting *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 141 (4th Cir. 1996)).

Because the FDCPA limitations provision states that "claims must be brought 'within one year from the date on which the violation occurs,'" *id.* (quoting 15 U.S.C. § 1692k(d)), and because "[t]his language 'unambiguously sets the date *of the violation* as the event that starts the one-year limitations period,'" *id.* (quoting *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (emphasis added by *Bender*)), the Fourth Circuit concluded that "Section 1692k(d) establishes a separate one-year limitations period for each violation of the FDCPA,'" *id.* Echoing Plaintiff's argument here, the Fourth Circuit explained that under the opposite interpretation of the statute, "so long as a debtor does not initiate suit within one year of the first violation, a debt collector would be permitted to violate the FDCPA with regard to that debt indefinitely and with impunity." *Id.* "As the statutory text makes clear, Congress did not intend such a result." *Id.*

Applying that conclusion, the Fourth Circuit held that it was error to dismiss the plaintiffs' action as time-barred because the plaintiffs had alleged at least two potential FDCPA violations within the one-year statute of limitations. *Id.* at 408. The same reasoning squarely applies to the mortgage statements at issue here. Plaintiff alleges that Shellpoint continued

30

sending him misleading mortgage statements through May 2019, only three months before Plaintiff filed his original Complaint, ECF No. 1, and well within the FDCPA statute of limitations as the Fourth Circuit has now interpreted it.. Accordingly, Plaintiff's claim is timely.

In the alternative, Defendants argue that the mortgage statements are not actionably misleading under the applicable "least sophisticated consumer" standard. ECF No. 22-1 at 20. Under that standard, "[w]hether a communication is false, misleading, or deceptive in violation of § 1692e is determined from the vantage of the 'least sophisticated consumer.'" *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 394 (4th Cir. 2014) (quoting *Nat'l Fin. Servs., Inc.*, 98 F.3d at 136). The test is "an objective standard that evaluates § 1692e claims based upon how the least sophisticated consumer would interpret the allegedly offensive language." *Id.* at 394–95. Courts applying the standard "consider how a 'naive' consumer would interpret the statement," but "do not give credit to 'bizarre or idiosyncratic interpretations'; [courts] assume 'a quotient of reasonableness and . . . a basic level of understanding and willingness to read with care.'" *Elyazidi*, 780 F.3d at 234 (quoting *Nat'l Fin. Servs., Inc.*, 98 F.3d at 136).

Defendants argue that Plaintiff has acknowledged that the mortgage statements he received after his discharge were "for information purposes only" and that "[l]ooking at the Statement as a whole, it could not reasonably mislead the least sophisticated consumer regarding whether a payment was required on discharged debt." ECF No. 22-1 at 21 (citing ECF No. 20 ¶ 114). Defendants then quote language from the June 22, 2018 statement, which includes a box on the first page titled "Bankruptcy Message," under which bold letters state that "[o]ur records show that either you are a debtor in bankruptcy or you discharged personal liability for your mortgage loan in bankruptcy." *Id.* (citing ECF No. 22-9 at 2).

Also in the box is language stating "[w]e are sending this statement to you for informational and compliance purposes only. It is not an attempt to collect a debt against you." *Id.* (quoting ECF No. 22-9 at 2). Finally, on the second page, the statement includes text reading "Important Notice: Shellpoint Mortgage Servicing is a debt collector. This is not an attempt to collect a debt due to your bankruptcy filing." ECF No. 22-9 at 3. Defendants conclude that the text in the Bankruptcy Message box and the Important Notice are sufficient to render the mortgage statement not false or misleading under the least sophisticated consumer standard. ECF No. 22-1 at 21.

Plaintiff in response highlights his allegations in the CFAC that the mortgage statements also include a section titled "Explanation of Payment Amount" which shows a "Regular Monthly Payment" amount and a "Total Payment Amount," both in bold lettering. ECF No. 25 at 11; ECF No. 20 ¶ 113. Those descriptions precisely match the June 22, 2018 statement that Defendants have submitted, as do Plaintiff's allegations that the statements include a detachable portion showing a "Payment Date" and "Payment Amount." ECF No. 20 ¶ 113; ECF No. 22-9 at 2. The June 22, 2018 statement shows a "Payment Date" of July 1, 2018 and a "Payment Amount" of $360,520.54. ECF No. 22-9 at 2.

Plaintiff does not discuss his allegations from the CFAC regarding the "Understanding Your Monthly Mortgage Statement" section of the statements. Instead, he appears to make new assertions about language and fees sought in some of the statements that were not made in the CFAC and thus will not be considered. *Compare* ECF No. 20 ¶ 114 *with* ECF No. 25 at 11–12. The Court notes that while the CFAC's allegations about that section somewhat mirror the June 22, 2018 statement, the final page of which is labeled "Understanding Your Monthly Mortgage Statement," ECF No. 22-9 at 4, the language Plaintiff alleges was included on such pages

appears to differ meaningfully from the language that appears on the June 22, 2018 statement, *compare* ECF No. 20 ¶ 114 *with* ECF No. 22-9 at 4.

The Court will decline to dismiss Plaintiff's claim at this stage for two reasons. First, the only basis Defendants have offered for finding that the mortgage statements were not misleading as a matter of law is the June 22, 2018 statement. Defendants do not claim that each of the statements Plaintiff was sent were identical to that one, nor do they address the differences between Plaintiff's allegations about the statements' content and the statement Defendants have provided. This lack of clarity about the actual language of the statements at issue essentially forecloses the Court from making dispositive determinations of law at this stage and counsels strongly in favor of revisiting this issue later in the litigation with the benefit of a fuller record.

Second, even if each of the mortgage statements at issue were identical in relevant part to the June 22, 2018 statement, the Court cannot conclude that they would not be misleading under the least sophisticated consumer standard. To be sure, the "Bankruptcy Message" portion of the statement, including the disclaimer that the statement is "for informational and compliance purposes only," as well as the explanation that the mailing "is not an attempt to collect a debt due to your bankruptcy filing," are indications that the statements are not demanding payment.

But when applying the least sophisticated consumer standard, courts must be mindful that "[u]nsophisticated readers may require more explanation than do federal judges; what seems pellucid to a judge, a legally sophisticated reader, may be opaque to someone whose formal education ended after sixth grade." *Smith v. Cohn, Goldberg & Deutsch, LLC*, 296 F. Supp. 3d 754, 759 (D. Md. 2017) (quoting *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1020 (7th Cir. 2014)). Here, the June 22, 2018 statement includes several notations that at least muddy the waters with respect to Plaintiff's immediate obligations to Shellpoint, including in the

"Explanation of Payment Amount" section that Plaintiff has highlighted, which shows a "Regular Monthly Payment" and "Total Payment Amount," both with dollar figures, and the detachable portion showing a "Payment Date" and "Payment Amount." ECF No. 22-9 at 2; *see* ECF No. 20 ¶ 113; ECF No. 25 at 11.

In light of these ambiguities, the Court concludes that dismissal of the FDCPA claim stemming from the mortgage statements would be inappropriate at this stage. This determination is without prejudice, however, to Defendants' right to raise the same arguments at a later stage on the basis of a complete record. But at present, Plaintiff has made plausible allegations with respect to the statements that are not displaced by the document Defendants have offered, and Plaintiff's claim therefore may proceed.

### iii.  FDCPA Damages

Defendants finally argue that Plaintiff's Count One claim for actual damages under the FDCPA should be dismissed because his damages allegations are deficient. ECF No. 22-1 at 22 (citing ECF No. 20 ¶ 63). "Debt collectors that violate the FDCPA are liable to the debtor for actual damages, costs, and reasonable attorney's fees." *Russell*, 763 F.3d at 389 (citing 15 U.S.C. § 1692k(a)(1), (a)(3)). Actual damages may include emotional damages, which though they "may be slight . . . are nonetheless viable." *Ademiluyi v. Pennymac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 536 (D. Md. 2013). "The FDCPA also provides the potential for statutory damages up to $1,000 subject to the district court's discretion." *Russell*, 763 F.3d at 389 (citing 15 U.S.C. § 1692k(a)(2)(A)). "The FDCPA is a strict liability statute, meaning that a consumer need only prove one violation in order to establish liability." *Carroll v. Paul Law Office, PLLC*, No. DKC 12-2041, 2013 WL 4008873, at *2 (D. Md. Aug. 2, 2013).

The CFAC alleges in Count One that Shellpoint's violations of the FDCPA caused Plaintiff "to endure damages including out-of-pocket costs, fear of losing the Property, worry about where he would live, very heavy stress, severe headaches and stomach aches, sleepless nights, eating disorders, excessive worry, mental and emotional distress." ECF No. 20 ¶ 63. Plaintiff further alleges that "Shellpoint's conduct was the proximate cause of Plaintiff's injuries, rendering Defendants liable for actual damages to Plaintiff" and "for statutory damages." *Id.* ¶ 64. Defendants insist that Plaintiff suffered no actual harm from the alleged violations and that his allegations of emotional distress "are too conclusory and not connected to the purported violation." ECF No. 22-1 at 22. Defendants further argue that Plaintiff "does not allege what emotional distress damages are attributable to this FDCPA claim versus those damages that allegedly arose" from the conduct at issue in his earlier litigation. *Id.* at 22–23.

Defendants fall short on both fronts. First, Plaintiff has alleged that he suffered a number of physical ailments as a result of Defendants' alleged unlawful conduct, as well as emotional harm. ECF No. 20 ¶ 63. In *Best III*, the Court denied summary judgment on FDCPA claims based on similar assertions, finding that Plaintiff's emotional distress and its physical manifestations, to which he testified at his deposition, "were sufficient to proceed, even if the damages ultimately awarded would be minimal." *Best III*, 2020 WL 1503676, at *17 (citing *Thomas v. Smith, Dean & Assocs.*, No. ELH-10-CV-3441, 2011 WL 2730787, at *4 (D. Md. July 12, 2011)). The same finding is appropriate here, though Plaintiff will of course have to establish evidence of his claimed harms.

As for a causal link between Plaintiff's claimed harm and the allegedly unlawful action by Shellpoint, the CFAC explicitly alleges in Count One that Shellpoint's violations caused the Plaintiff to endure damages that included the loss of the property, fear for where he would live

and the stress-related conditions one would reasonably expect to follow and that "Shellpoint's

conduct was the proximate cause of Plaintiff's injuries." ECF No. 20 ¶¶ 63–64. Plaintiff need not

allege more to proceed. Defendants will have the opportunity to challenge evidence for the

linkage between the claimed violations and the claimed harm at a subsequent stage of the

litigation.

   In their Reply, Defendants reiterate their arguments challenging Plaintiff's claims of

actual damages, which they dismiss as "absurd." ECF No. 28 at 11. Defendants also read

Plaintiff's Opposition to argue that he may proceed with claims for statutory damages even if he

has no actual damages; in response, Defendants claim that without actual damages, Plaintiff

lacks Article III standing to pursue any FDCPA claims. *Id.* But it does not appear that Plaintiff

made such an argument. Plaintiff merely asserted that Defendants' claim that he did not suffer

actual damages is improperly raised in a Motion to Dismiss. *See* ECF No. 25 at 14.

   Further, the Court has already found Plaintiff's allegations of actual damages sufficiently

plausible to advance, and they are also sufficient to demonstrate the injury-in-fact necessary for

Article III standing. *See Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017) (identifying the

requirements for standing). Defendants' belated standing argument thus does not disturb the

Court's findings as to Plaintiffs' FDCPA claims.

### iv.  SAC FDCPA Claims

   Before turning to Plaintiff's next set of statutory claims, the Court addresses the new

allegations in the proposed SAC that Plaintiff asserts support his FDCPA claims. According to

Plaintiff's Reply in Support of his Motion for Leave, Plaintiff asserts that two sets of factual

allegations support two sets of FDCPA claims. ECF No. 37 at 3. First, Plaintiff cites his

allegations that in or about November 2019, he received correspondence from Shellpoint

demanding he pay $500 for "Attorney Cost Disbursement" and $189.79 for REO LP Hazard Disbursement," the first of which Plaintiff alleges "appeared to be totally unjustified." *Id.* (citing ECF No. 30-3 ¶¶ 58–59). Plaintiff states that these factual allegations support the claims in Count One that Shellpoint violated §§ 1692e(2), 1692e(5), 1692e(10), and 1692(f)(1) of the FDCPA by threatening to collect inflated or unjustifiable fees. *Id.* (citing ECF No. 30-3 ¶ 73).

In contrast to the allegations of inflated fees in the CFAC, Plaintiff has this time identified specific fees that he was allegedly charged. But he still provides no basis for his claim that they were unjustified or inflated. Without a reference or an explanation demonstrating an unlawful or improper basis for assessing these fees – for example, a provision in the governing Deed of Trust – Plaintiff has failed to state a claim. His bare allegation that the Attorney Cost Disbursement "appeared to be totally unjustified" is plainly inadequate. ECF No. 30-3 ¶ 59. Accordingly, any FDCPA claim based on these alleged fees cannot proceed, and the Motion for Leave to Amend will be denied on futility grounds as to this element of the FDCPA claims.

The other set of new allegations in the proposed SAC that Plaintiff claims support an FDCPA claim concern the scheduling of foreclosure sales in February 2020 and March 2020. ECF No. 37 at 3 (citing ECF No. 30-3 ¶¶ 74–75). Plaintiff asserts that a loss mitigation application was pending at that time and that Shellpoint accordingly could not schedule either sale. ECF No. 30-3 ¶¶ 63–70. Plaintiff does not provide additional information about the allegedly pending application, but he appears to be referring to the application he had allegedly submitted on January 2, 2019. *See id.* ¶ 48. Taking as true the allegation that the application remained pending when Defendants scheduled foreclosure sales in February and March 2020, Plaintiff appears to have stated an additional RESPA-based FDCPA claim with respect to those sales. Accordingly, that aspect of the proposed SAC is not futile and will advance.

### 2. MCDCA Claims

The MCDCA "prohibits debt collectors from utilizing threatening or underhanded methods in collecting or attempting to collect a delinquent debt." *Sterling*, 943 F. Supp. 2d at 596 (quoting *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *9 (D. Md. Jan. 22, 2013)). Plaintiff asserts claims under two provisions of the Act. The first provision, § 14-202(8) of the Commercial Law Article of the Maryland Code, "provides that a debt collector may not '[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist.'" *Id.* (alteration in original) (quoting Md. Code Ann., Com. Law § 14-202(8)). The second, § 14-202(11), provides that debt collectors may not "engage in conduct that violates the FDCPA." *Ellis v. Palisades Acquisition XVI LLC*, No. JKB-18-03931, 2019 WL 3387779, at *6 (D. Md. July 26, 2019) (citing Md. Code Ann., Com. Law § 14-202(11)).

Plaintiff brings three MCDCA claims that partly mirror his FDCPA claims. First, he alleges that Shellpoint violated § 14-202(8) "by attempting to collect or claiming a right to collect charges and fees that were inflated or otherwise unjustified." ECF No. 20 ¶ 66. The Court has already rejected the corresponding FDCPA claim for lack of specificity and finds the same result appropriate here. As described previously, the CFAC fails to identify any specific fees that were allegedly collected, nor does it explain how any such fees were inflated or unjustified. Accordingly, this element of the MCDCA claims will be dismissed. Similarly, the Court will also deny as futile the component of the Motion for Leave that asserts a new MCDCA claim concerning the two fees Plaintiff claims he was charged in November 2019. ECF No. 30-3 ¶¶ 58–59, 79; *see* ECF No. 37 at 3.

Plaintiff next asserts, again implicitly invoking RESPA regulations, that Shellpoint "violated § 14-202(8) by threatening to hold a foreclose [sic] auction sale without acting on

Plaintiff's loss mitigation application that was Shellpoint received [sic] well-over 37 days prior to the date of the scheduled foreclosure auction sale." ECF No. 20 ¶ 67. Reasserting their earlier argument challenging Plaintiff's RESPA-based FDCPA claim, Defendants first contend that Plaintiff did not submit a complete loss mitigation application within 37 days of any of the scheduled foreclosure sales at issue. ECF No. 22-1 at 25. While Plaintiff's claim is unspecific about which of the several scheduled foreclosure sales is at issue in the MCDCA claim, because Defendants have read the claim broadly to address all of the allegedly scheduled sales, the Court does as well. And as the Court has already found, Plaintiff has plausibly alleged that he submitted completed loss mitigation applications that Shellpoint failed to resolve before scheduling foreclosure sales.

Defendants next argue that Plaintiff has failed to adequately plead that Shellpoint knew it had no right to schedule the foreclosure sales. *Id.* "Unlike the FDCPA, the MCDCA is not a strict liability statute." *Ben-Davies v. Blibaum & Assocs., P.A.*, 421 F. Supp. 3d 94, 100 (D. Md. 2019). Generally, "[t]o state a claim under the MCDCA, a plaintiff must establish two elements: (1) the defendant 'did not possesses the right to collect the amount of debt sought'; and (2) the defendant 'attempted to collect the debt knowing that they lacked the right to do so.'" *Barr v. Flagstar Bank, FSB*, 303 F. Supp. 3d 400, 420 (D. Md. 2018) (quoting *Lewis v. McCabe, Weisberg & Conway, LLC*, No. DKC 13-1561, 2014 WL 3845833, at *6 (D. Md. Aug. 4, 2014)).

"The 'knowledge' requirement of the MCDCA refers to 'actual knowledge or reckless disregard as to the falsity of the information or the existence of the right.'" *Cooke*, 2019 WL 3241128, at *6 (quoting *Spencer v. Hendersen-Webb, Inc.*, 81 F. Supp. 2d 582, 595 (D. Md. 1999)). Defendants assert that Plaintiff failed to plead facts demonstrating this element of his claim. But Plaintiff expressly, repeatedly, and plausibly alleges in the CFAC that Shellpoint

39

knew his loss mitigation applications had not been fully processed when it scheduled each of the foreclosure sales and accordingly knew that the sales were unlawful. ECF No. 20 ¶¶ 36, 39, 51. Plaintiff need not allege more to make out a claim under § 14-202(8), premised on Shellpoint's known lack of a right to foreclose given the requirements of 12 C.F.R. § 1024.41.

Plaintiff has also adequately pleaded a violation of § 14-202(11) of the MCDCA. Because that provision prohibits "conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act," codified at 15 U.S.C §§ 1692c through 1692k, and because Plaintiff has already plausibly alleged violations of 15 U.S.C. § 1692e with respect to the foreclosure sales, Plaintiff's claim under § 14-202(11) may proceed. While case law concerning § 14-202(11) appears limited, to the extent the knowledge requirement of § 14-202(8) applies to § 14-202(11) as well, Plaintiff has set forth adequate allegations to that effect, as just explained.

Defendants finally argue that the MCDCA claims should be dismissed because Plaintiff suffered no actual damages as a result of the alleged violations. ECF No. 22-1 at 25–26. § 14-203 of the Commercial Law Article provides that a debt collector "who violates any provision of this subtitle is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury." Md. Code Ann., Com. Law § 14-203; *see Allen v. Silverman Theologou, LLP*, No. JFM-14-3257, 2015 WL 2129698, at *7 (D. Md. May 6, 2015) ("In contrast to the FDCPA, which permits recovery of statutory damages and attorney's fees, MCDCA § 14-203 only allows recovery of damages proximately caused by its violation").

The CFAC alleges in the MCDCA claim that "Defendants' violations caused the Plaintiff to endure damages including out-of-pocket costs, fear of losing the Property, worry about where [he would] live, anxiety about losing the family home, very heavy stress, severe headaches and

stomach aches, sleepless nights, eating disorders, excessive worry, [and] mental and emotional

distress." ECF No. 20 ¶ 72. Defendants assert that Plaintiff "cannot explain how he suffered

unspecified 'out-of-pocket' costs as a result" of the scheduled foreclosures. ECF No. 22-1 at 26.

But Defendants ignore that the statute explicitly provides for liability for emotional distress and

mental anguish damages as well as pecuniary harm. *See Allen*, No. JFM-14-3257, at *7. As the

Court previously found with respect to similarly alleged FDCPA damages, Plaintiff has met his

burden at this stage to plead damages from Defendants' alleged violations.

Accordingly, the CFAC's claims under § 14-202(8) and § 14-202(11) arising from the

allegedly unlawful scheduling of foreclosure sales may proceed. Turning then to the remaining

MCDCA allegations in the proposed SAC, Plaintiff asserts that his new allegations concerning

the February and March 2020 foreclosure sales give rise to further MCDCA claims under § 14-

202(8) and § 14-202(11). ECF No. 30-3 ¶¶ 63–70, 80–81; ECF No. 37 at 3. For the same reasons

that the viable CFAC MCDCA claims may proceed, so too may the proposed SAC's new

MCDCA claims arising from the 2020 scheduled sales, which Plaintiff alleges were set while his

loss mitigation applications remained pending. ECF No. 30-3 ¶¶ 64, 69. Accordingly, the Motion

for Leave will be granted as to this aspect of the SAC.

### 3. MCPA Claims

Plaintiff next asserts claims under two provisions of the MCPA. ECF No. 20 ¶¶ 74–76.

That statute "prohibits 'unfair or deceptive trade practices,' Md. Code Ann., Com. Law § 13-301,

and expressly designates as 'unfair or deceptive trade practices' those that constitute any

violation of the MCDCA." *Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp. 2d 719, 732 (D.

Md. 2011) (citing Md. Code Ann., Com. Law § 13-301(14)(iii)); *see also Hawkins v. Kilberg*,

165 F. Supp. 3d 386, 390 (D. Md. 2016) (noting that "a violation of the MCDCA is a per se

violation of the MCPA"). Plaintiff alleges that Defendants violated § 13-301(14)(iii) by violating §§ 14-202(8) and 14-202(11) of the MCDCA. ECF No. 20 ¶ 74. Because Plaintiff has plausibly alleged violations of those provisions, Plaintiff has also plausibly alleged an MCPA claim.

Plaintiff further alleges that Defendants violated § 13-316(c) of the MCPA. *Id.* ¶¶ 75–76. "That provision governs 'mortgage servicing' and, among other requirements, provides that a 'servicer shall designate a contact to whom mortgagors may direct complaints and inquiries' and that the 'contact shall respond in writing to each written complaint or inquiry within 15 days if requested.'" *Cooke v. Carrington Mortgage Servs.*, No. TDC-18-0205, 2018 WL 6323116, at *7 (D. Md. Dec. 3, 2018) (quoting Md. Code Ann., Com. Law § 13-316(c)). "[A] mortgagor must request a response in order to trigger the servicer's duty to provide one." *Trionfo v. Bank of Am., N.A.*, No. JFM-15-925, 2015 WL 5165415, at *7 (D. Md. Sept. 2, 2015).

The CFAC asserts that "Shellpoint violated § 13-316(c) by failing to reasonably respond to Plaintiff's inquiries" and "to respond within 15 days." ECF No. 20 ¶¶ 75–76. Plaintiff does not specifically identify which inquiries he refers to in the CFAC, but Defendants do not challenge his claim on that basis, and it appears that Plaintiff is referencing several of his alleged QWRs. *See* ECF No. 20 ¶¶ 16–17, 24, 29, 33, 34–36, 38, 42–43, 45–46, 52, 55–57, 77. Defendants argue that the claim fails because Plaintiff did not allege that he relied on any misrepresentations by Defendants. ECF No. 22-1 at 27. But in support of that argument, Defendants point to case law concerning claims under another provision of the MCPA, § 13-408, for which consumer plaintiffs must demonstrate reliance on material omissions by defendants. *See id.* (citing *Stewart*, 859 F. Supp. 2d at 769). Defendants do not explain how that authority applies in this context, and prior courts assessing § 13-316(c) claims have not drawn such a connection. *See, e.g.*, *Cooke*, 2018 WL 6323116, at *7. This argument is thus unpersuasive.

Defendants next argue that Plaintiff failed to allege facts demonstrating he suffered an identifiable injury for the alleged violations. ECF No. 22-1 at 27–28. To be sure, "section 13-316 provides a remedy only for economic damages arising from a mortgage servicer's failure to respond to an inquiry." *Cooke*, 2018 WL 6323116, at *7 (citing Md. Code Ann., Com. Law § 13-316(e)). But courts have nonetheless consistently found damages allegations like those Plaintiff makes here – out-of-pocket costs coupled with mental and emotional distress that manifests in physical symptoms, ECF No. 20 ¶ 78 – sufficient to state a claim when plaintiffs directly attribute the harm to MCPA violations. *See Cooke*, 2018 WL 6323116, at *7, (citing *Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 468 (D. Md. 2013); *Cole v. Fed. Nat'l Mortg. Ass'n*, No. GJH-15-3960, 2017 WL 623465, at *8 (D. Md. Feb. 14, 2017))).

Defendants finally argue that Plaintiffs' claims must be dismissed because § 13-316(c) is preempted by federal law. ECF No. 22-1 at 28–30. The Fourth Circuit has described the three types of federal preemption of state law:

> Courts recognize three types of federal preemption: (1) express preemption, in which Congress expressly states its intent to preempt state law, *Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1997); (2) field preemption, in which Congress occupies a certain field by "regulating so pervasively that there is no room left for the states to supplement federal law," *id.* (citing *Fid. Federal Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)), or where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Arizona* [*v. United States*, 567 U.S. 387, 399 (2012)] (citation and internal quotation marks omitted); and (3) conflict preemption, arising when state law is preempted "to the extent it actually conflicts with federal law," *Cox*, 112 F.3d at 154 (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983)). The Supreme Court has instructed that conflict preemption "includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, [567 U.S. at 399] (citations and internal quotation marks omitted).

*United States v. South Carolina*, 720 F.3d 518, 528–29 (4th Cir. 2013).

Defendants here assert that the 15-day response requirement at § 13-316(c)(2) "is in direct conflict with . . . RESPA and its implementing regulations governing a servicer's responsibilities to respond to qualified written requests, which do not require mortgage servicers to respond within a mere 15 days of receiving a request." ECF No. 22-1 at 29. Specifically, Defendants argue, 12 U.S.C. § 2605(e)(2) gives mortgage servicers 30 days to respond to QWRs from borrowers, whereas § 13-316(c)(2) requires a response within 15 days. *Id.* Defendants argue that Maryland law thus "conflicts with federal such that compliance with both is impossible" because "[a] servicer responding to a [QWR] within the time allotted by RESPA will inherently violate Maryland's law that mandates a shorter response time than Congress intended to impose on mortgage servicers." *Id.* at 29–30.

Defendants thus appear to claim that § 13-316(c)(2) is subject to conflict preemption. But this argument is meritless on its face. A state law that requires a mortgage servicer to respond to an inquiry within 15 days simply does not conflict with a federal law granting 15 additional days for a response. A servicer can comply with both statutes simply by responding within 15 days. Alternatively, as Plaintiff observes, the servicer can provide one response within 15 days under the MCPA and another within the additional 15-day RESPA period. ECF No. 25 at 17. This is not a case in which simultaneous compliance with both statutes "is a physical impossibility." *Arizona*, 567 U.S. at 399.[11]

Additionally, RESPA has an explicit anti-preemption clause providing that the statute "does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the

---

[11] Notably, Defendants' Reply limits their initial claim of impossibility and argues that compliance with both statutes is merely "impractical." ECF No. 28 at 16.

extent that those laws are inconsistent with any provision of this chapter, and then only to the

extent of the inconsistency." 12 U.S.C. § 2616. "Thus, state laws that are not inconsistent with

RESPA are not preempted by RESPA." *Ervin v. JPMorgan Chase Bank NA*, No. GLR-13-2080,

2014 WL 4052895, at *3 (D. Md. Aug. 13, 2014) (citing *Munoz v. Fin. Freedom Senior Funding

Corp.*, 567 F. Supp. 2d 1156, 1164 (C.D. Cal. 2008)).

Applying this provision, the Maryland Court of Special Appeals has twice rejected

RESPA-based federal preemption challenges to Maryland foreclosure procedures. *See Neto v.

Devan*, No. 2404, Sept. Term, 2018, 2020 WL 4038017, at *2–*3 (Md. App. July 17, 2020);

*Vach v. Ward*, No. 0831, Sept. Term, 2015, 2016 WL 1643968, at *4 (Md. App. Apr. 26, 2016).

The Court follows the same path here and concludes that § 13-316(c) is not inconsistent with

RESPA and is therefore not preempted. Accordingly, Plaintiff's § 13-316(c) claim may proceed

alongside his claim under § 13-301(14)(iii).

Finally, the proposed SAC alleges that Plaintiff inquired about the two charges Shellpoint

assessed in November 2019 in a December 21, 2019 letter that requested a response within 15

days, but that Shellpoint failed to respond entirely. ECF No. 30-3 ¶¶ 60–61. Plaintiff asserts that

these allegations support another § 13-316(c) claim, ECF No. 37 at 3 (citing ECF No. 30-3 ¶¶

88–89), and the Court agrees that this claim may proceed for the same reasons that the CFAC's

similar claim may proceed. The Motion for Leave will thus be granted with respect to that claim.

The proposed SAC also alleges an additional per se violation of § 13-301(14)(iii)

resulting from the additional MCDCA violation that the proposed SAC asserts. ECF No. 37 at 3

(citing ECF No. 30-3 ¶¶ 80–81, 87). Because the Court has found that additional MCDCA claim

sufficiently plausible, the MPCA claim stemming from it may also proceed.

### 4.  MMFPA Claims

Defendants next move to dismiss Plaintiff's claim under the MMFPA. "The MMFPA prohibits mortgage fraud during the mortgage lending process." *Barr*, 303 F. Supp. 3d at 416 (citing Md. Code Ann., Real Prop. § 7-401(d)). "The 'mortgage lending process' includes servicing the loan." *Id.* at 417 (citing Md. Code Ann., Real Prop. § 7-401(e)(2); *Stovall v. SunTrust Mortg., Inc.*, No. RDB-10-2836, 2011 WL 4402680, at *10 (D. Md. Sept. 20, 2011)); *see also Marchese*, 917 F. Supp. 2d at 469. "To state an MMFPA claim, the plaintiff 'must plead the elements of a common law fraud claim.'" *Barr*, 303 F. Supp. 3d at 416 (quoting *Galante v. Ocwen Loan Servicing LLC*, No. ELH-13-1939, 2014 WL 3616354, at *28 (D. Md. July 18, 2014)). "And, [Federal] Rule [of Civil Procedure] 9(b)'s heightened pleading standard applies to a claim brought under the MMFPA." *Galante*, 2014 WL 3616354, at *28.

The CFAC alleges that Defendants committed mortgage fraud "by knowingly making, as described herein, deliberate misstatements and misrepresentations, including threatening to sale [sic] Plaintiff's Property with the intent that the misstatements and misrepresentations be relied on by Plaintiff." ECF No. 20 ¶ 81. Defendants first argue that Plaintiff's claim does not "come remotely close to meeting the heightened pleading requirements" of Rule 9(b). ECF No. 22-1 at 30. "Under the rule, a plaintiff alleging claims that sound in fraud 'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Galante*, 2014 WL 3616354, at *9 (quoting *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010)).

Plaintiff's sole argument is that the claim is adequately pleaded under Rule 9(b) because it alleges that on November 29, 2018, January 3, 2019, and March 28, 2019, B&S sent notices of scheduled foreclosure sales to Plaintiff's residence. ECF No. 25 at 18. This purported summary

of the allegations in the CFAC does not match the pleading, however. The CFAC instead asserts that B&S scheduled sales to be held on those dates, rather than that those are the dates of the correspondence B&S sent informing Plaintiff of the scheduled sales. *See* ECF No. 20 ¶ 89. The CFAC specifically alleges that Plaintiff "sent at least four letters—dated 11/14/2018, 12/24/2019 and 01/02/2019 & 3/19/2019—seeking to stop illegally scheduled foreclosure sales for 11/29/2018, 01/03/2019 and 03/28/2019." *Id.*

The CFAC cannot be read to allege that B&S sent the notice of the first of these sales on November 29, 2018 because Plaintiff alleges that he sent a letter seeking to stop that sale over two weeks earlier on November 14, 2018. *See id.* Moreover, the allegations concerning dates come from Plaintiff's RESPA claim; Plaintiff makes no such specific allegations in his MMFPA claim. Because the essential detail of the date of the alleged misrepresentations is absent, the Court cannot conclude that Plaintiff has "state[d] with particularity the circumstances constituting fraud" as Rule 9(b) requires. Fed. R. Civ. P. 9(b).

Additionally, with respect to the reliance element of a common law fraud claim, Plaintiff alleges only that Defendants made misstatements and misrepresentations "with the intent that they be relied on by Plaintiff." ECF No. 20 ¶ 81. Plaintiff does not allege that he actually relied on the purported misrepresentations, which is a required element for an MMFPA claim. *Ayres v. Ocwen Loan Servicing, LLC*, 129 F. Supp. 3d 249, 274 (D. Md. 2015); *see Barr*, 303 F. Supp. 3d at 415 (quoting *Dean v. Beckley*, No. CCB-10-297, 2010 WL 3928650, at *4 (D. Md. Oct. 1, 2010) (stating the elements of a common law fraud clam, including that "the plaintiff relied upon the misrepresentation and had the right to rely upon it with full belief of its truth"). For these reasons, the MMFPA claim asserted in the CFAC will be dismissed.

In his Reply in support of his Motion for Leave, Plaintiff attempts to premise two new MMFPA claims on new allegations in the proposed SAC. First, Plaintiff points to the allegations about correspondence he received seeking payment of certain fees in November 2019. ECF No. 37 at 3 (citing ECF No. 30-3 ¶¶ 58–59). Plaintiff fails to explain how the assessment of those fees constitutes mortgage fraud, however, nor does he allege that he relied on a misrepresentation by Defendants. This aspect of the Motion for Leave will thus be denied as futile. Second, Plaintiff asserts that his allegations about the scheduling of foreclosure sales in February 2020 and March 2020 give rise to an MMFPA claim. *Id.* (citing ECF No. 30-3 ¶¶ 63–70). But Plaintiff makes no allegations of any statements concerning those sales at all, let alone fraudulent misrepresentations. The new allegations thus do not state an MMFPA claim, and Plaintiff accordingly may not proceed with any MMFPA claims.

### 5. RESPA Claims

The Court turns next to Plaintiff's RESPA claims. The CFAC alleges that Shellpoint violated multiple provisions of RESPA by failing to adequately respond to four letters that Plaintiff sent seeking information, including the identity of the owner of his loan, and three letters seeking to stop the allegedly unlawful foreclosure sales. ECF No. 20 ¶¶ 88–89. The Court considers each element of Plaintiff's claims in turn.

#### i. 12 U.S.C. § 2605(e)(1)

Plaintiff first alleges that Defendants violated 12 U.S.C. § 2605(e), which "imposes a duty on loan servicers to respond to borrower inquiries and take certain actions with respect to such inquiries." *Cole*, 2017 WL 623465, at *6 (citing 12 U.S.C. § 2605(e)). "Borrower inquiries triggering these duties are known as 'qualified written requests' or QWRs." *Id.* As the Court has noted, the statute defines a QWR as

> a written correspondence, other than notice on a payment coupon or other
> payment medium supplied by the servicer, that--
> (i) includes, or otherwise enables the servicer to identify, the name and
> account of the borrower; and
> (ii) includes a statement of the reasons for the belief of the borrower, to
> the extent applicable, that the account is in error or provides sufficient
> detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

"A servicer is required to respond to a QWR from a borrower only to the extent that the QWR seeks 'information relating to the servicing of [a] loan.'" *Cooke*, 2018 WL 6323116, at *8 (alteration in original) (quoting 12 U.S.C. § 2605(e)(1)(A)). "'Servicing' is defined as 'receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.'" *Id.* (alteration in original) (quoting 12 U.S.C. § 2605(i)(3)). "If any servicer of a federally related mortgage loan receives a [QWR] from the borrower . . . for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A).

After listing eight letters that Plaintiff allegedly sent Shellpoint between September 2018 and April 2019, the CFAC alleges that Shellpoint violated § 2605(e)(1)(A) "by failing to acknowledge receipt of Plaintiff's letter within 5 days." ECF No. 20 ¶¶ 88–90. The CFAC does not assert that these letters were QWRs in the RESPA claim, although as the Court described previously, Plaintiff alleges in the background section of the CFAC that he submitted several QWRs to Shellpoint in that period. *See* ECF No. 20 ¶¶ 16–18, 24, 38, 42, 45, 52, 54, 55.

Defendants' only argument concerning the date or dates of the alleged QWRs is that Shellpoint was not required to respond because Plaintiff received a discharge in bankruptcy in March 2017, and a provision of Regulation X, 12 C.F.R. § 1024.36(f)(1)(v)(B), states that a request for information to a servicer is untimely if made more than one year after the loan is discharged. *Id.* at 32.[12] None of the dates that Plaintiff asserts he sent QWRs are within the one-year period following his discharge, *see* ECF No. 20 ¶ 16, and Defendants are correct that § 1024.36(f)(1)(v)(B) exempts servicers from the substantive response requirement.

As Plaintiff observes, however, the following paragraph of the regulation, § 1024.36(f)(2), states that if a servicer determines that an § 1024.36(f)(1) exception applies, "the servicer shall notify the borrower of its determination in writing not later than five days (excluding legal public holidays, Saturdays, and Sundays) after making such determination." The notice must "set forth the basis under paragraph (f)(1) . . . upon which the servicer has made such determination." 12 C.F.R. § 1024.36(f)(2). Plaintiff maintains that Defendants never sent such a determination notice and Defendants do not answer this argument in their Reply. The Court will thus decline to dismiss Plaintiff's QWR claims on this basis.

Defendants next argue that the purported QWRs did not contain inquiries triggering the duty to respond under RESPA because they did not seek information about servicing of the loan. ECF No. 22-1 at 32–33. The CFAC alleges that Plaintiff's "initial" QWR "sought to receive an update on [the] November 2017 loss mitigation application" he submitted to Capital One, and "requested information about the Note (and any endorsements if applicable), the identity of the

---

[12] 12 C.F.R. § 1024.36 "addresses QWRs seeking information." *Nash v. PNC Bank, N.A.*, No. TDC-16-2910, 2017 WL 1424317, at *6 (D. Md. Apr. 20, 2017). The preceding section, § 1024.35, describes the alternative form of QWR, a "notice of error." *See id.* Plaintiff does not assert that any of his alleged QWRs here were notices of error.

owner of the loan and the master servicer, the loan's transaction history, a payoff and reinstatement quote, and the invoice(s)" for two fees Shellpoint assessed. ECF No. 20 ¶¶ 17–18.

"Courts have repeatedly held that requests for information related to loan modifications do not concern 'servicing' and therefore are not QWRs." *Nash*, 2017 WL 1424317, at *5 (collecting cases). Accordingly, Plaintiff's request for an update about his loss mitigation application did not render the correspondence a QWR. But "a communication from a borrower that includes multiple requests, some of which relate to the servicing of a mortgage loan and some of which do not, can still be considered a QWR for purposes of triggering the response requirements." *Cooke*, 2018 WL 6323116, at *8 (citing *Martins v. Wells Fargo Bank, N.A.*, No. CCB-16-1070, 2016 WL 7104813, at *3 (D. Md. Dec. 6, 2016)). The Court accordingly reviews the remaining components of the alleged QWR, any of which may trigger the duty to respond.

Most of the alleged components of the correspondence do not render it a QWR. First, "[r]equests for information pertaining to the identity of a note holder or master servicer do not relate to servicing." *In re McGinley*, 490 B.R. 723, 728 (Bankr. D. Md. 2013) (quoting *Kelly v. Fairon & Assocs.*, 842 F. Supp. 2d 1157, 1160 (D. Minn. 2012)). Additionally, Plaintiff's request for "information about the Note" is vague, but appears to suggest that Plaintiff was asking for the chain of title of the Note, which courts have also found is a subject that does not relate to servicing. *Cooke*, 2018 WL 6323116, at *8 (citing *Barr*, 303 F. Supp. 3d at 418). The same is true of requests for a loan's transaction history and the owner of the loan. *See Richardson v. Rosenberg & Assocs. LLC*, No. WDQ-13-0822, 2014 WL 823655, at *8 (D. Md. Feb. 27, 2014) (finding inquiries about loan transaction history and loan owner identity did not relate to servicing and that letters in which they were made were not QWRs); *see also Reed v. PNC Mortg.*, No. AW-13-1536, 2013 WL 3364372, at *4 (D. Md. July 2, 2013).

Next, as at least one court has observed, 12 C.F.R. § 1024.36 specifically provides that "[a] request for a payoff balance need not be treated by the servicer as a request for information." *See Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 98–99 (D.D.C. 2016) (citing 12 C.F.R. § 1024.36(a)); *see also Cooke*, 2018 WL 6323116, at *9 (citing this finding in *Mohamed* to support a conclusion that a purported QWR did not relate to servicing). Accordingly, Plaintiff's request for a payoff statement did not trigger the duty to respond. That leaves as a possible trigger "the invoice(s) for fees Shellpoint identified as 'Property Inspection Disbursement/Payment' and 'FC Costs or Miscellaneous – nr Payment.'" ECF No. 20 ¶ 18.

Unlike the remainder of the subjects Plaintiff alleges he raised in his correspondence, fees charged by a servicer plainly relate to the servicing of the loan and inquiries about such charges therefore render the borrower's correspondence a QWR. *See Cooke*, 2018 WL 6323116, at *9 (citing *Pendleton v. Wells Fargo Bank, N.A.*, 993 F. Supp. 2d 1150, 1152 (C.D. Cal. 2013)). Accordingly, Plaintiff has adequately alleged that he sent correspondence constituting a QWR and that Shellpoint therefore breached an applicable statutory duty to acknowledge receipt in writing within five days. 12 U.S.C. § 2605(e)(1)(A).

### ii.   12 U.S.C. § 2605(e)(2)

The next element of Plaintiff's RESPA claim alleges that Shellpoint violated 12 U.S.C. § 2605(e)(2)(A)-(C) by failing to take action on his QWR. ECF No. 20 ¶ 91. § 2605(e)(2) directs that within 30 days of receipt of a QWR, the servicer must:

> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes-- (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the

borrower is correct as determined by the servicer; and (ii) the name and
telephone number of an individual employed by, or the office or
department of, the servicer who can provide assistance to the borrower; or
(C) after conducting an investigation, provide the borrower with a written
explanation or clarification that includes-- (i) information requested by the
borrower or an explanation of why the information requested is
unavailable or cannot be obtained by the servicer; and (ii) the name and
telephone number of an individual employed by, or the office or
department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2). Defendants make no argument in response to this element of the CFAC

apart from their arguments challenging the § 2605(e)(1)(A) claim and do not contest that

Shellpoint failed to respond to Plaintiff's request for information about the fees Shellpoint

assessed. This element of the RESPA claim thus may also proceed.

### iii.  12 U.S.C. § 2605(k)(1)(D)

Next, the CFAC alleges that Shellpoint violated 12 U.S.C. § 2605(k)(1)(D) "by failing to

provide Plaintiff with the identity of the true owner of the loan within 10 business days of

Plaintiff's request for such information." ECF No. 20 ¶ 92. That provision requires that "[a]

servicer of a federally related mortgage shall not . . . fail to respond within 10 business days to a

request from a borrower to provide the identity, address, and other relevant contact information

about the owner or assignee of the loan." 12 U.S.C. § 2605(k)(1)(D). The CFAC alleges that

Plaintiff's QWR requested information about the owner of his loan but that Shellpoint did not

respond until significantly later, when it sent Plaintiff a letter naming FNMA New Res AA

322040091 as the owner of Plaintiff's loan. ECF No. 20 ¶¶ 18, 29–30.

While the CFAC does not provide a date for this response, the allegations indicate that

substantial time, and certainly more than 10 business days, had passed since Plaintiff's inquiry.

More importantly, Defendants' Motion to Dismiss does not mention this element of Plaintiff's

RESPA claim and Defendants thus do not appear to seek its dismissal. Accordingly, Plaintiff's

claim under § 2605(k)(1)(D) may continue.

### iv.  12 U.S.C. § 2605(f)

Finally, Plaintiff brings two claims that he asserts arise under 12 U.S.C. § 2605(f), the

damages provision of RESPA. One is a RESPA-based assertion of the Regulation X claim that

Plaintiff also asserted as an FDCPA violation, alleging that Shellpoint violated 12 C.F.R. §

1024.41(g) by scheduling foreclosure sales while Plaintiff's timely filed loss mitigation

applications remained pending. ECF No. 20 ¶ 95. § 1024.41(a) directs that borrowers may

enforce the provisions of that section pursuant to 12 U.S.C. § 2605(f), and courts have found that

§ 2605(f) creates a private cause of action for borrowers to enforce violations of § 1024.41. *See*

*Robinson v. Nationstar Mortg. LLC*, No. TDC-14-3667, 2019 WL 4261696, at *5–*6 (D. Md.

Sept. 9, 2019).

Defendants make the same arguments in response to this claim that they make to oppose

it in the FDCPA context, namely that the allegations in the CFAC are too vague to determine

whether the foreclosure sales were scheduled unlawfully and that Plaintiff's loss mitigation

applications were not complete. ECF No. 22-1 at 35–36. The Court has already rejected both

arguments and thus need not reassess them here. Because Plaintiff has plausibly alleged that

Defendants scheduled foreclosure sales despite his pending complete loss mitigation

applications, Plaintiff's claim under § 2605(f) and § 1024.41(g) may proceed.

Plaintiff's second claim asserts that Shellpoint violated 12 C.F.R. § 1024.36(d)(2)(i)(B)

by failing to timely provide information Plaintiff requested. ECF No. 20 ¶¶ 93–94. Under

§ 1024.36(d)(2)(i), when a borrower submits a request to a servicer that seeks information other

than the identity, address, or contact information of the owner or assignee of the mortgage, the

servicer must respond within 30 days. *See* 12 C.F.R. § 1024.36(d)(2)(i)(A)-(B). Requests under § 1024.36 are not subject to the QWR response time requirements unless they qualify as QWRs under 12 U.S.C. § 2605(e). *Nash*, 2017 WL 1424317, at *6.

Plaintiff cites § 2605(f) as providing his cause of action for this claim. ECF No. 20 ¶¶ 93–94. However, § 1024.36 has no analogous provision to § 1024.41(a) providing that violations may be enforced through § 2605(f). Courts have somewhat split over whether § 2605(f) creates a private right of action to enforce violations of Regulation X provisions that do not explicitly create a right in the manner that § 1024.41(a) does. *See In re Coppola*, 596 B.R. 140, 153 & n.49 (Bankr. D.N.J. 2018) (summarizing the split and collecting cases). After reviewing these authorities, the Court is persuaded that it does not.

First, several of the cases finding that other Regulation X provisions are privately enforceable through § 2605(f) rely on a footnote in the Consumer Financial Protection Bureau final rule establishing Regulation X. The footnote states that "regulations established pursuant to section 6 of RESPA are subject to section [2605(f)] of RESPA, which provides borrowers a private right of action to enforce such regulations." Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10,696, 10,714 n.64 (Feb. 14, 2013); *see, e.g.*, *Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254, 271 (S.D.N.Y. 2017) (citing this language); *Ford v. Nationstar Mortg., LLC*, No. 2:16-cv-00344-RFB-PAL, 2018 WL 2418541, at *3 (D. Nev. May 28, 2018) (same).

Other language in the same rule, however, narrows the reach of that statement. In a section discussing the scope of § 1024.41, the rule explains that "[b]orrowers have a private right of action to enforce the procedural requirements in § 1024.41, as set forth in § 1024.41(a); borrowers do not, however, have a private right of action under the Bureau's rules to enforce the

requirements set forth in § 1024.38." Mortgage Servicing Rules, 78 Fed. Reg. at 10,818. Plainly, the Bureau intended that no private right of action be available under § 1024.38. As a result, the general statement in the footnote cannot be read to mean that the Bureau intended all Regulation X provisions to be privately enforceable through § 2605(f). Rather, where the Bureau intended that private plaintiffs be able to sue to enforce a Regulation X provision, it so stated, as it did with § 1024.41(a).

Additionally, this Court has concluded in the past that no cause of action exists to enforce §§ 1024.38 and 1024.40 of Regulation X. *Agomuoh*, 2017 WL 657428, at *10 (citing *Brown v. Bank of N.Y. Mellon*, No. 1:16-CV-194(LMB/IDD), 2016 WL 2726645, at *2 (E.D. Va. May 9, 2016); *Jones v. Select Portfolio Servicing, Inc.*, No. 3:16-CV-2331-K-BN, 2016 WL 6581279, at *6 (N.D. Tex. Oct. 12, 2016)). And the case law on which the Court relied in making that finding drew the same distinction between the explicit cause of action language in § 1024.41(a) and the lack of such language in the other Regulation X provisions. *See Brown*, 2016 WL 2726645, at *2; *Jones*, 2016 WL 6581279, at *6 (citing *Smith v. Nationstar Mortg.*, No. 15-13019, 2015 WL 7180473, at *3–*4 (E.D. Mich. Nov. 16, 2015) (drawing this distinction and also examining language concerning § 1024.38 in the CFPB final rule)).

For these reasons, the Court finds that § 2605(f) of RESPA does not provide a private cause of action to enforce alleged violations of § 1024.36 of Regulation X. Accordingly, Plaintiff's claim will be dismissed.

### v.  RESPA Damages

Defendants finally argue that Plaintiff's RESPA claims must fail because Plaintiff failed to plead actual damages as a result of Shellpoint scheduling foreclosure sales and not timely responding to Plaintiff's letters. ECF No. 22-1 at 36. Under 12 U.S.C. § 2605(f), "an individual

plaintiff must plead either actual damages as a result of the RESPA violation or 'a pattern or practice of noncompliance' with RESPA requirements." *Offiah v. Bank of Am., N.A.*, No. DKC 13-2261, 2014 WL 4295020, at *3 (D. Md. Aug. 29, 2014).

Defendants correctly note that the CFAC's only allegation of actual damages in the RESPA claim is that Plaintiff suffered "pecuniary damage and emotional and mental distress." ECF No. 20 ¶ 98. Plaintiff argues that he adequately asserted pecuniary damages elsewhere in the CFAC, including the costs of filing for bankruptcy to stop the first improper foreclosure sale, "time and money expended preparing and sending correspondence," namely the eight letters Plaintiff sent seeking information about the loan and seeking to stop the foreclosures, and "inflated and unjustifiable costs that should have been removed." ECF No. 25 at 22 (citing ECF No. 20 ¶¶ 26, 60, 66, 68, 88–89).

As the Court has already found repeatedly, Plaintiff has failed to demonstrate that any inflated and unjustifiable costs were improper, and these allegations accordingly cannot serve as damages allegations to support Plaintiff's RESPA claim. Nor can Plaintiff's allegations about the costs of submitting correspondence. Nowhere in the CFAC does Plaintiff mention that he expended funds mailing letters to Shellpoint or provide a dollar amount. Additionally, "[c]ourts have somewhat split on whether the costs of mailing correspondence to a servicer can constitute actual damages under § 2605(f)." *Sharma v. Rushmore Loan Mgmt. Servs., LLC*, No. GJH-18-565, 2020 WL 1323007, at *15 (D. Md. Mar. 20, 2020).

While this Court has accepted the approach holding that "such administrative costs are actual damages if they were incurred 'in response to the RESPA violation,'" it would be unreasonable to find that a Plaintiff can satisfy the pleading plausibility threshold by merely alluding to administrative costs in a filing subsequent to a complaint. *Id.* (quoting *Robinson*,

2019 WL 4261696, at *8). While the Court has looked to various sections of the CFAC for allegations supporting Plaintiff's claims, the pleading is devoid of any allegation about the costs Plaintiff incurred in mailing letters to Shellpoint. Accordingly, administrative costs cannot serve as Plaintiff's RESPA damages allegation.

Plaintiff also fails to allege in the CFAC that he actually expended funds filing for bankruptcy to stop the first foreclosure sale. In fact, the docket in that case reveals that Plaintiff, who represented himself, successfully submitted an application to waive the filing fee because of his lack of assets. Application to Have the Chapter 7 Filing Fee Waived, First Bankruptcy Case (Nov. 29, 2016), ECF No. 4; Order Granting Debtor(s)' Application for Waiver of Chapter 7 Filing Fee, First Bankruptcy Case (Dec. 16, 2016), ECF No. 19. Plaintiff therefore cannot rely on purported costs of "filing for bankruptcy" as damages he suffered as a result of Defendants' alleged RESPA violations.

In short, none of the grounds to which Plaintiff points in his Opposition as the source of his RESPA damages are sufficient. Nor is the conclusory assertion of "emotional and mental distress" in the CFAC, which Plaintiff essentially abandons in his Opposition. ECF No. 20 ¶ 98; *see* ECF No. 25 at 22. The CFAC also alleges that "Shellpoint's violations against Plaintiff are numerous and consistent, constituting a 'pattern or practice' of noncompliance with the requirements of 12 U.S.C. § 2605." ECF No. 20 ¶ 97. While an adequately pleaded pattern or practice of noncompliance can suffice for RESPA damages, *Offiah*, 2014 WL 4295020, at *3, Plaintiff's mere recital of the standard here is plainly insufficient. Accordingly, because Plaintiff has failed to set forth a plausible damages allegation, all of his RESPA claims will be dismissed.

Additionally, while Plaintiff argues in support of his Motion for Leave to file the proposed SAC that his new allegations support three new RESPA claims, ECF No. 37 at 3,

because Plaintiff has added no new allegations of damages, those claims cannot proceed. The Motion for Leave will therefore be denied as futile with respect to Plaintiff's RESPA claims.

### 6.   TILA Claims

Plaintiff's final set of claims proceed under TILA. "Congress passed TILA 'to assure a meaningful disclosure of credit terms' by 'mandat[ing] that creditors make specific disclosures before extending credit to consumers.'" *Sterling*, 943 F. Supp. 2d at 590 (alteration in original) (quoting *Jones v. Koons Automotive, Inc.*, 752 F. Supp. 2d 670, 682 (D. Md. 2010)). Before turning to Plaintiff's claims, the Court pauses to address his allegations about the owner of his loan. The CFAC alleges in an unclear and contradictory manner, with almost no dates provided for the various events alleged, that multiple entities have owned the loan. Plaintiff first alleges that Capital One "claimed it acquired the Note and later claimed to be the servicer for the loan owner, Federal National Mortgage Association." ECF No. 20 ¶ 10. The Court notes that in *Best III*, Plaintiff's prior case concerning the same mortgage and property, it was undisputed that Fannie Mae was the owner of the loan. *See Best III*, 2020 WL 1503676, at *1, *10.

The CFAC next asserts that Shellpoint responded to one of Plaintiff's inquiries about the owner of his loan by informing him that "FNMA New Res AA 322040091 was the owner of Plaintiff's loan." ECF No. 20 ¶ 30. Shellpoint then allegedly responded to a later inquiry by stating that "New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing was the current the owner [sic] of the loan and that Shellpoint serviced the loan." *Id.* ¶ 34. However, Plaintiff alleges that he later unsuccessfully attempted to reach FNMA New Res AA 322040091 by mail to confirm that it was the owner of his loan, and mailed Shellpoint a QWR notifying it of his failed attempt to reach the FNMA entity. *Id.* ¶¶ 41–42. There are no other allegations about any steps

Plaintiff took on the belief that Shellpoint owned his loan, nor does Plaintiff allege that Shellpoint and the FNMA entity were consecutive owners of the loan.

Reading these allegations together, Plaintiff has not plausibly alleged that Shellpoint owned his loan at any time. Rather, his single mention of Shellpoint's claimed ownership in a letter appears to be an unspecific reference to a communication that may have somewhat obscured the identity of the loan's owner. Further, Plaintiff continues and increases this ambiguity in his Opposition, stating that "Shellpoint purported to be the current servicer of the loan" and "[t]herefore, the Complaint alleges that Shellpoint was an owner and servicer." ECF No. 25 at 24. An allegation that Shellpoint was the owner of the loan merely because it purported to be the servicer is not plausible.

An exhibit to Defendants' Motion to Dismiss, Shellpoint's June 11, 2018 letter to Plaintiff informing him that Shellpoint had taken on the servicing of his loan, strengthens this conclusion. ECF No. 22-3. Plaintiff discussed the letter in the CFAC, ECF No. 20 ¶ 14, and based his first FDCPA claim entirely on its alleged omissions of information about his loan, *see id.* ¶¶ 15, 59. While Plaintiff now concedes that the FDCPA claim is untimely, ECF No. 25 at 3–4, the document is nonetheless integral to the CFAC and may be considered by the Court at this time. *See Brennan*, 361 F. Supp. 3d at 502.

The letter makes clear that Shellpoint was not the owner of Plaintiff's loan, stating:

> Dear Homeowner:
>
> Shellpoint Mortgage Servicing ("Shellpoint") welcomes you! We're pleased that the owner of your mortgage has entrusted us to service your account.
>
> The servicing of your mortgage is being transferred. Effective 06/01/2018, the servicing of your mortgage loan (collecting payments, paying taxes and insurance, etc.) transfers from Capital One, N.A. to Shellpoint.

ECF No. 22-3 at 3. Plainly, Shellpoint does not represent that it acquired ownership of the loan, but rather that the loan's owner had made Shellpoint its new servicer. In light of this evidence, and the vagueness of the CFAC's allegation on the subject, the Court will disregard the allegation that Shellpoint was at some unspecified time the owner of Plaintiff's loan.

Turning to Plaintiff's claims, the CFAC first asserts that Shellpoint violated 15 U.S.C. § 1641(f)(2) by failing to provide required contact information for the owner of Plaintiff's loan after he requested it. ECF No. 20 ¶¶ 18, 101. In relevant part, that provision states that "[u]pon written request by the obligor, the servicer shall provide the obligor, to the best knowledge of the servicer, with the name, address, and telephone number of the owner of the obligation or the master servicer of the obligation." 15 U.S.C. § 1641(f)(2). "TILA creates a private cause of action for actual and statutory damages for this violation." *Combs v. Bank of Am., N.A.*, No. GJH-14-3372, 2015 WL 5008754, at *4 (D. Md. Aug. 20, 2015) (citing 15 U.S.C. 1640(a)).

Defendants argue that this aspect of Plaintiff's TILA claims is time-barred because TILA has a one-year statute of limitations and the communication in which Plaintiff requested information on the owner of his loan was sent on July 19, 2018. ECF No. 22-1 at 37 (citing ECF No. 20 ¶¶ 16–18). While TILA's statute of limitations is one year, *see* 15 U.S.C. § 1640(e), Defendants overlook Plaintiff's allegation that he sent letters in September and November 2018 and in April 2019 seeking information including the identity of the owner of the loan. ECF No. 25 at 22–23 (citing ECF No. 20 ¶ 88). Those inquiries were within the one-year period preceding the filing of the original Complaint on August 14, 2019, and Plaintiff's claim is therefore timely to the extent it relies on those letters.

Nonetheless, Plaintiff's claim fails as a matter of law because courts have repeatedly found that a servicer cannot be held liable for breaching the obligation at § 1641(f)(2) because

TILA only imposes liability on creditors and their assignees. *See, e.g.*, *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 714–19 (6th Cir. 2013); *Bernstein v. Wells Fargo & Co.*, No. 1:18-CV-02887-RWS-CMS, 2018 WL 7018007, at *10–*11 (N.D. Ga. Nov. 28, 2018) (collecting cases); *Banks v. Green Tree Servicing, LLC*, No. 14-cv-2825, 2015 WL 1058124, at *5 (N.D. Ill. Mar. 5, 2015); *see also Kemp v. Seterus, Inc.*, 348 F. Supp. 3d 443, 446 (D. Md. 2018) ("TILA . . . imposes civil liability only on creditors and, only in limited circumstances, assignees of creditors."). Plaintiff's § 1641(f)(2) claim is asserted only against Shellpoint, his servicer, and therefore cannot proceed.

The CFAC next alleges that "NewRez violated TILA, 15 U.S.C. § 1641(g)(1) by failing to notify the Plaintiff that the ownership of the loan had been transferred to it." ECF No. 20 ¶ 102. Under that provision, "parties assuming home loans, and thereby becoming new creditors, must disclose the assignment to the borrower in writing by a certain date." *Barr v. Flagstar Bank, F.S.B.*, No. RDB-13-2654, 2014 WL 4660799, at *2 (D. Md. Sept. 17, 2014). This claim fails because as discussed previously, Plaintiff has not plausibly alleged that Shellpoint, which he alleges is the trade name of NewRez, was the owner of his loan at any time. ECF No. 20 ¶ 5. The claim will therefore be dismissed.

Plaintiff next alleges that Defendants violated 15 U.S.C. § 1639g by failing to timely provide an accurate payoff statement. ECF No. 20 ¶ 103. That provision states in full that "[a] creditor or servicer of a home loan shall send an accurate payoff balance within a reasonable time, but in no case more than 7 business days, after the receipt of a written request for such balance from or on behalf of the borrower." 15 U.S.C. § 1639g. Defendants correctly argue that this claim is time-barred. The CFAC mentions a request for a payoff statement only in a July 19, 2018 letter, more than one year before the filing of this action. ECF No. 20 ¶¶ 16, 18. While

Plaintiff protests that the CFAC also alleges that he sent two more letters to Shellpoint seeking answers outlined in his earlier correspondence, he offers no dates for those letters, nor specificity about their contents. ECF No. 25 at 23 (citing ECF No. 20 ¶ 24). Plaintiff has thus failed to plausibly allege that he requested a payoff statement within the statute of limitations period and this claim will accordingly be dismissed.

Plaintiff's final claim is that Defendants violated 15 U.S.C. § 1638(f) by failing to transmit him periodic mortgage statements after May 2019. ECF No. 20 ¶ 104. That provision directs that "[t]he creditor, assignee, or servicer with respect to any residential mortgage loan shall transmit to the obligor, for each billing cycle, a statement setting forth" several pieces of information relating to the loan, including "[t]he amount of the principal obligation under the mortgage" and "[t]he current interest rate in effect for the loan." 15 U.S.C. § 1638(f)(1)(A)-(B); *see Cole*, 2017 WL 623465, at *5. Defendants do not move to dismiss this claim on its merits, but instead correctly argue that Plaintiff has failed to adequately allege actual damages for violation of that section. ECF No. 22-1 at 39 n.15.

The damages allegations in Plaintiff's TILA claim merely quote from the damages provision of the statute, 15 U.S.C. § 1640, and state that Defendants are liable for "emotional damages and pecuniary costs" without elaboration. ECF No. 20 ¶ 100. These assertions are facially insufficient. Plaintiff protests in his Opposition that he "has had to expend out of pocket costs to obtain or attempt to obtain information that Defendants should have disclosed or provided," including in "researching, preparing, and sending correspondence." ECF No. 25 at 23–24. The CFAC makes no such allegations in the TILA claims, however, and Plaintiff does not provide any actual dollar amount of damages.

Plaintiff finally asserts that he was charged improper fees that would have been removed if he had been sent mortgage statements. *Id.* at 24. Plaintiff provides no more specificity or evidence of these fees than he did for his other fee-based claims, and they will accordingly be rejected in this context as well. Plaintiff has therefore failed to demonstrate any ground for actual damages. As a result, his § 1638(f) claim must be dismissed because 15 U.S.C. § 1640 provides that statutory damages are unavailable for violations of that provision. *Izmirligil v. Select Portfolio Servicing, Inc.*, No. 17-CV-6157 (PKC) (LB), 2020 WL 1941192, at *10 (E.D.N.Y. Apr. 22, 2020). Therefore, none of Plaintiff's TILA claims may proceed.

### 7.  Fannie Mae

Defendants finally argue that Fannie Mae should be dismissed from this action because the CFAC mentions it only briefly and lacks sufficiently specific allegations that it committed wrongdoing. ECF No. 22-1 at 42–43. Plaintiff names Fannie Mae in asserting his MCDCA, MCPA, MMFPA, and TILA claims. The Court has dismissed the TILA and MMFPA claims in full and thus need not consider them further. In the MCPA claims, Plaintiff mentions Fannie Mae only in the claim under § 13-301(14)(iii), the per se violation that follows from violations of the MCDCA. ECF No. 20 ¶ 74.

Accordingly, the primary remaining allegation against FNMA in the CFAC is in the MCDCA claims, in which Plaintiff asserts that FNMA violated § 14-202(8) "when Shellpoint attempted to collect illegal fees and scheduled an illegal foreclosure sale." *Id.* ¶ 71. The CFAC alleges that "[u]nder respondeat superior, NewRez and FNMA are liable for Shellpoint's acts," and that "Shellpoint was operating as an agent and on behalf of NewRez and/or FNMA when it caused the illegal foreclosure sales to be scheduled." *Id.* ¶¶ 69–70. "Agency is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another

[the agent] that the other shall act on his behalf and subject to his control and consent by the other so to act." *Allen v. Bank of Am., N.A.*, 933 F. Supp. 2d 716, 728 (D. Md. 2013) (alterations in original) (quoting *Ins. Co. of N. Am. v. Miller*, 765 A.2d 587, 593 (Md. 2001)).

Defendants argue persuasively that this allegation of a principal-agent relationship between FNMA and Shellpoint is conclusory and insufficient to render Fannie Mae liable under a vicarious liability theory. ECF No. 22-1 at 42. The only assertion of a relationship between Shellpoint and Fannie Mae is Plaintiff's vague claim that Shellpoint acted as the agent "of NewRez and/or FNMA." ECF No. 20 ¶ 69. Plaintiff offers no grounds, factual or legal, to support that proposition. While courts have found generally that a mortgage loan servicer can serve as the agent of the loan owner, *see, e.g.*, *Warden v. PHH Mortg. Corp.*, No. 3:10-CV-75, 2010 WL 3720128, at *4–*5 (N.D. W. Va. Sept. 16, 2010), Plaintiff has not expressly alleged here that Fannie Mae is the owner of his loan. In fact, Plaintiff describes Fannie Mae in identifying the parties to the action only as "the nation's largest purchaser of mortgage loans," ECF No. 20 ¶ 6, and offers no additional detail or explanation of a connection or agreement between Fannie Mae and Shellpoint. Accordingly, Plaintiff has not plausibly demonstrated a basis for an agency relationship between Shellpoint and Fannie Mae that could render Fannie Mae liable for Shellpoint's alleged misconduct.

Additionally, as Defendants note, courts have held that Fannie Mae is subject to a doctrine barring vicarious liability for federal instrumentalities arising from unauthorized acts of their agents. Defendants point to *Faiella v. Federal National Mortgage Association*, in which the First Circuit concluded that the principle, known as the *Merrill* doctrine, prevented Fannie Mae, the assignee of the plaintiff's mortgage loan, from being held liable for allegedly unlawful acts by the loan's servicer that gave rise to claims under "several federal and state debt collection and

consumer protection laws and regulations." 928 F.3d 141, 143–44 (1st Cir. 2019). Because

Fannie Mae is a federal instrumentality, the First Circuit held, and because the plaintiff's claims

were "predicated on the theory that Fannie Mae should be held to account for the acts of [the

servicer's] employees . . . [which] the record [did] not show were actually authorized by Fannie

Mae," summary judgment for Fannie Mae was appropriate. *Id.* at 149.

Several other courts have recognized the same principle. *See Gray v. Seterus, Inc.*, 233 F.

Supp. 3d 865, 869–70 (D. Or. 2017) (collecting cases); *Cannon v. Wells Fargo Bank N.A.*, 917 F.

Supp. 3d 1025, 1034–35 (N.D. Cal. 2013); *Denton v. Nationstar Mortg. LLC*, No. 18-CV-241-

GKF-JFJ, 2020 WL 1917486, at *3–*4 (N.D. Okla. Apr. 20, 2020). Here, because Plaintiff has

not adequately alleged the existence of an agency relationship between Shellpoint and Fannie

Mae, the Court need not reach the subsequent question whether Fannie Mae would be immune

from liability even if Shellpoint were its agent. The Court notes, however, that Plaintiff has also

made no allegations with respect to whether Fannie Mae authorized the acts by Shellpoint that

give rise to Plaintiff's claims, further undermining the plausibility of Plaintiff's already limited

allegations against Fannie Mae. For these reasons, the remaining MCDCA and MCPA claims

against Fannie Mae will be dismissed, and Fannie Mae will be dismissed as a Defendant.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the pending

substantive motions, with the exception of B&S's second Motion to Dismiss, ECF No. 24, which

will be granted, and B&S's first and third Motions to Dismiss, which will be denied as moot,

ECF Nos. 12, 33.

Shellpoint and Fannie Mae's Motion to Dismiss the CFAC, ECF No. 22, will be granted

in part and denied in part. With respect to the FDCPA claims, the Court will dismiss Plaintiff's

claims: (1) under 15 U.S.C. §§ 1692e(2), 1692e(5), 1692e(10), and 1692f(1) concerning collection of fees; (2) under § 1692f(6) concerning scheduled foreclosure sales; and (3) alleging violations of Regulation X, and thereby of the FDCPA, in the scheduling of the foreclosure sale that Plaintiff filed a bankruptcy petition on August 9, 2018 to stop. The Court will also dismiss Plaintiff's: (4) MCDCA claim under § 14-202(8) of the Commercial Law Article of the Maryland Code relating to collection of fees; (5) MMFPA claim; (6) RESPA claims; and (7) TILA claims.

The Court will deny the Motion to Dismiss with respect to Plaintiff's: (1) FDCPA claim arising from alleged violations of Regulation X, except for the claim concerning the foreclosure sale that Plaintiff filed a bankruptcy petition on August 9, 2018 to stop; (2) FDCPA claim under § 1692e(2), 1692e(10) arising from the mortgage statements that Defendants sent Plaintiff after his bankruptcy discharge; (3) MCDCA claims under § 14-202(8) of the Commercial Law Article of the Maryland Code relating to scheduling of foreclosure sales and (4) under § 14-202(11) of the Commercial Law Article; and (5) MCPA claims under § 13-301(14)(iii) of the Commercial Law Article arising from the alleged violation of the MCDCA and (6) under § 13-316(c) for failure to timely respond to Plaintiff's inquiries.

With respect to Plaintiff's Motion for Leave to File a Second Amended Complaint, ECF No. 30, the Motion will be denied as futile with respect to Plaintiff's new claims: (1) under 15 U.S.C. §§ 1692e(2), 1692e(5), 1692e(10), and 1692f(1) concerning collection of fees; (2) under § 14-202(8) of the Commercial Law Article of the Maryland Code relating to collection of fees; (3) under the MMFPA; and (4) under RESPA.

The Motion for Leave will be granted with respect to Plaintiff's new claims: (1) alleging violations of Regulation X, and thereby of the FDCPA, in the scheduling of the February 2020

and March 2020 foreclosure sales; (2) under § 14-202(8), 14-202(11) of the Commercial Law Article of the Maryland Code relating to scheduling of foreclosure sales; and (3) under § 13-301(14)(iii) of the Commercial Law Article arising from the new violation of the MCDCA alleged in the proposed SAC; and (4) under § 13-316(c) for failure to respond to Plaintiff's December 21, 2019 letter.

Finally, Defendant Fannie Mae will be dismissed from this action, leaving Shellpoint as the only Defendant. A separate Order shall issue.

Date: <u>September 11, 2020</u>                    <u>    /s/                            </u>
                                                                     GEORGE J. HAZEL
                                                                     United States District Judge